IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 01-60535

WORLDWIDE LABOR SUPPORT OF MISSISSIPPI, INC.,

Plaintiff-Counter Defendant-Appellant,

versus

UNITED STATES OF AMERICA,

Defendant-Counter Claimant-Appellee.

Appeal from the United States District Court
For the Southern District of Mississippi

November 15, 2002

Before KING, Chief Judge, and HIGGINBOTHAM and EMILIO M. GARZA,
Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Worldwide Labor Support of Mississippi, Inc. appeals the

district court's grant of summary judgment to the government in the

amount of $2,019,888.77 for employment taxes, accruals of interest,

and statutory additions.  The district court held that the hourly

per diem travel expense reimbursements made by Worldwide to its

non-local employees were taxable wages. We vacate the summary

judgment and remand for further proceedings.

I

Worldwide provides temporary skilled labor to industrial and

commercial businesses, including Caterpillar, Inc. Facing labor

difficulties, Caterpillar from July 1994 through December 1995 leased workers from Worldwide.

Many of the workers remained at the Caterpillar job site in Aurora, Illinois seven days a week. In addition to an hourly wage, Worldwide paid an additional amount per hour to employees who lived more than 100 miles from the Caterpillar site as reimbursement for lodging, meals, and incidental expenses. While non-local employees received two fifty-cent increases in their hourly per diem after each of their first two months on the job, local employees to whom no per diem was paid instead received fifty-cent raises in their salaries. The per diem paid to non-local employees was computed on both regular hours and overtime hours. As a result, employees who were away from home for the same amount of time received different per diem payments because some worked more hours than others. No employment, unemployment, or income tax was paid on the amounts of these reimbursements.

The government audited the 1995 federal employment tax returns of Worldwide, determining that Worldwide was required to pay tax on the amounts of the per diem payments and assessing additional employment taxes. Worldwide paid $4,798.21, the amount assessed in each quarter for one of its employees and filed a claim for a refund of the amounts paid. The government denied the refund.

On March 2, 2000, Worldwide filed a claim in federal district court requesting a refund of the $4,798.21. The government counterclaimed for the unpaid balance of the assessments as to all

2

of the Worldwide employees who were paid travel expense reimbursements in the four quarters of 1995. The district court granted the government's motion for summary judgment and entered final judgment awarding the government $2,991,925.76. Worldwide timely appealed.

## II

The central question here is whether the monies paid on a hourly per diem basis by Worldwide to its non-local employees as reimbursed travel expenses count as "wages" which are subject to employment taxes. These payments are not subject to employment taxes if the payments are made subject to an "accountable plan" pursuant to 26 U.S.C. §§ 62(a)(2)(A) and 62(c), as defined by Treas. Reg. § 1.62-2(c).[1] A plan is "accountable" when (1) it covers only expenses with a business connection;[2] (2) all expenses are substantiated to the employer;[3] and (3) the employee is required to return to the employer any amount paid in excess of substantiated expenses.[4] If a plan does not meet these criteria, it is considered "nonaccountable" and is subject to withholding and employment taxes.[5]

---

[1] *See* Treas. Reg. § 1.62-2(h)(1).

[2] *Id*. at 1.62-2(d).

[3] *Id*. at 1.62-2(e).

[4] *Id*. at 1.62-2(f).

[5] *Id*. §§ 1.62-2(c)(3)(i) & 1.62-2(c)(5).

3

The regulations also specify how per diem arrangements such as Worldwide's can meet these requirements. A per diem allowance for travel expenses can meet the business connection requirement if it is "computed on a basis similar to that used in computing the employee's wages or other compensation (e.g. *the number of hours worked*, miles traveled, or pieces produced)" as long as "a per diem allowance computed on that basis was commonly used in the industry in which the employee is employed" on December 12, 1989.[6]

The substantiation requirement under the facts of this case is governed by rules promulgated in Rev. Proc. 94-77, which allow the reimbursement of travel expenses under a per diem plan in lieu of the substantiation of each expense as would otherwise be required. The rules provide that the amount of a per diem allowance deemed substantiated for each calendar day "is equal to the lesser of the per diem allowance for such day or the amount computed at the Federal per diem rate for the locality of travel for such day."[7]

Under Rev. Proc. 94-77, the returning amounts in excess of expenses requirement is satisfied under a per diem arrangement as long as employees are required to return allowances that "relate[] to days of travel not substantiated . . . even though the arrangement does not require the employee to return the portion of

---

[6] *Id.* § 1.62-2(d)(3)(ii) (emphasis added).

[7] Rev. Proc. 94-77, 1994-2 C.B. 825, § 4.01.

such an allowance that . . . exceeds the amount of the employee's expenses deemed substantiated."[8]

## III

This court reviews a grant of summary judgment *de novo*, applying the same standard as the district court.[9] The district court granted the government's motion for summary judgment because it concluded that the hourly per diem amounts paid by Worldwide were not made with the reasonable expectation that the employees would actually incur travel expenses in the amounts paid as an hourly per diem. Worldwide argues that there is a genuine issue of material fact as to whether its plan was reasonably calculated not to exceed the amount of expenses incurred by its employees. As the government argues, however, under Worldwide's arrangement, employees who should have been expected to incur similar travel expenses received dramatically different reimbursements because they worked more hours in the same number of days. Employees, particularly those who worked overtime, would inevitably receive reimbursements in excess of their reasonably anticipated expenses under Worldwide's scheme.

Worldwide relies on the Eleventh Circuit's decision in *Trucks, Inc. v. United States*.[10]  In *Trucks*, a trucking company reimbursed

---

[8]  *Id.* § 7.02; *see also id.* § 2.07.

[9]  *Holtzclaw v. DSC Communications Corp.*, 255 F.3d 254, 257 (5th Cir. 2001).

[10]  234 F.3d 1340 (11th Cir. 2000).

5

truckers for expenses on a per diem rate based on the "load revenue," which was calculated "primarily by the number of miles driven, but is modified to account for weather, unloading and reloading, and road conditions in the particular area."[11] Because the truck drivers were not required to turn in receipts and received the per diem even if they slept in their trucks instead of paying for lodging, reimbursement amounts could greatly exceed expenses.

In *Trucks*, as here, the appeal turned "on the question of whether Trucks, Inc. reasonably anticipated and calculated the drivers' expenses before reimbursing them."[12] Reversing the district court, the Eleventh Circuit concluded that "the focus of the business connection test is on the employer's reasonable expectations, not the drivers' actual expenditures. These questions of reliability and state of mind fall within the purview of the jury."[13] Applying that analysis to the trucking company at issue in that case, the *Trucks* court held that "[t]he reasonableness of both Trucks's calculations and anticipations is a jury question and not appropriate for summary judgment because Trucks has produced some evidence that its plan met the IRS requirements at the time."[14]

---

[11]  *Id.* at 1340.

[12]  *Id.* at 1343.

[13]  *Id.* at 1343-44 (citation omitted).

[14]  *Id.* at 1344.

We find this reasoning persuasive. We conclude that whether the employer reasonably anticipated and calculated its employees' travel expenses in the course of developing its reimbursement arrangement is essentially one of state of mind and that, so long as the employer produces summary judgment evidence that amounts to more than "'conclusory allegations, improbable inferences, and unsupported speculation,'" the issues of reasonableness and state of mind are proper questions for the jury and should not be decided on summary judgment.[15]

It is of no moment that *Trucks* and the other cases cited by the parties applying Treas. Reg. § 1.62-2 all involve the transportation industry, particularly truck drivers and messengers and couriers. Section 1.62-2 explicitly allows hourly per diem plans to qualify, under certain circumstances, as accountable plans without limitation as to the industry involved, despite the government's claim at oral argument that section 1.62-2's provisions are intended for application only to truck drivers, pilots, and messengers. Moreover, there is no dispute in this case that it was the custom in Worldwide's industry–the skilled temporary labor industry–on December 12, 1989 to use hourly per diem travel reimbursement arrangements.

---

[15] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).

Applying the reasoning of *Trucks*, we observe that Worldwide produced considerable summary judgment evidence of research it undertook to determine its per diem rates. In particular, Worldwide provided testimony by its president in his deposition, which describes the investigation Worldwide undertook before setting its rates.  We leave to the jury the question of whether Worldwide's reimbursements were reasonably calculated not to exceed the amount of the expenses incurred by its employees.

However, the government argues that, even if Worldwide had the expectation that its payments were calculated to meet and not exceed expenses, this expectation was not reasonable as a matter of law.  This is essentially what the district court found, and is the argument urged by the dissent. It is the central issue in this case. Worldwide attempts to answer this argument by pointing to a compilation of 1995 travel expense reimbursement records in the summary judgment evidence demonstrating that only 7.3% of its weekly reimbursements exceeded the federal weekly per diem rate and, in the aggregate for the year, its 1995 hourly per diem payments only varied from the federal weekly per diem rate aggregated over the same number of weeks by .76%.[16]

As the government and the dissent point out, the problem with Worldwide's argument is that the federal weekly per diem rate is not a reasonable guide because Worldwide's own research showed that

---

[16]  This $462 rate is based on a seven-day week, so it corresponds to a $66 daily rate.

8

the expenses its employees would likely incur for lodging and meals at local establishments was significantly less than that provided for by the federal weekly per diem rate for the locality. Specifically, the government argues that the federal lodging per diem for the locality is $40 per day and the meals and incidental expenses per diem is $26 per day, but Worldwide's research showed (according to an information sheet it provided to new hires) that its employees could find motel rooms for $21.00 to $32.50 per night with up to $26 per day for meals and incidental expenses. As such, the government argues that Worldwide's plan fails to meet the requirements of section 1.62-2 based on Worldwide's own research.

We are not persuaded, however, that judgment as a matter of law was appropriate. A jury could find that Worldwide reasonably anticipated each employee would generally receive either $48, $52, or $56 per day in travel reimbursements for working an eight-hour day.[17] This is only slightly more than the $47 per day that Worldwide's research showed that one of its employees would be required to spend if he stayed at the least expensive hotel in a double-occupancy room, is slightly less than the $58.50 per day in travel expenses Worldwide's research showed its employee would incur if he stayed at the most expensive hotel in a single-occupancy room, and is considerably less than the $66 per day the federal government reimburses its employees working away from home

_____

[17] These rates are based upon an eight-hour day at a $6.00, $6.50, or $7.00 hourly per diem rate.

9

in the same locality. Thus based on the summary judgment evidence relied upon by the government, a jury could find that Worldwide's reimbursement payments are reasonably calculated not to exceed the amount of its employees' anticipated expenses. Moreover, the extent to which Worldwide's expectation was not reasonable because Worldwide knew or should have known that some or even many of its non-local employees would work overtime is quintessentially a fact issue as to reasonableness and state of mind for the jury to decide based on its assessment of the witness testimony and evidence presented to it.

The government and the dissent urge that a daily per diem plan would better meet the requirements of Treas. Reg. § 1.62-2, as would an hourly per diem plan which did not reimburse based on overtime hours worked. The question before us, however, is not what plan Worldwide might have used but the conformity of the plan it did use. Any hourly per diem arrangement will not bear a strict logical relation to anticipated expenses that are incurred on a daily and not hourly basis. Yet the government's own regulations in Treas. Reg. § 1.62-2 and Rev. Proc. 94-77 explicitly allow for hourly per diem arrangements to qualify as accountable plans under section 1.62-2.[18] This argument seems to whistle past the government's own regulations.

---

[18] *See, e.g.*, Treas. Reg. § 1.62-2(d)(3)(ii); *see also* Rev. Proc. 94-77, 1994-2 C.B. 825.

The dissent disputes this point, arguing that flight attendants and truck drivers incur expenses that are proportional to the number of hours worked, but Worldwide employees did not. This is not the case. A flight attendant who works eight hours a day pays the same price for a hotel room as a flight attendant who works for ten hours. Insofar as some expenses are incurred on a daily—as opposed to hourly—basis, an hourly per diem arrangement will not perfectly correspond with these expenses. Given that the regulations permit hourly per diem arrangements, the question cannot be whether the per diem perfectly corresponds to the expenses incurred but rather whether it is reasonably calculated to reimburse employees for their expenses. We believe that there is enough summary judgment evidence here to permit the jury to determine that question.

The case relied upon by the government and the dissent, the Ninth Circuit's decision in *Shotgun Delivery, Inc. v. United States*,[19] can be distinguished from the case before us. In *Shotgun*, a messenger and courier service employed drivers who used their own vehicles to make pick-ups and deliveries. Shotgun billed its customers based primarily on the mileage from the pick-up to the delivery location, which did not necessarily reflect the actual driving distance because drivers often "doubled up," carrying more

---

[19]   269 F.3d 969 (9th Cir. 2001).

than one customer's package at a time.[20] Shotgun also charged surcharges for waiting time, rush delivery, and excessive weight, further weakening any direct relationship between delivery charges and miles driven in making the deliveries.[21]

Shotgun paid its drivers a commission basis, amounting to 40% of the delivery charges for the jobs they completed, but issued two checks in order to avoid employment taxes:

> The first check (the "wage check") compensated the drivers, at the minimum wage, for the hours they worked. Shotgun withheld the appropriate employment taxes from the wage checks. The second check (the "mileage check") was issued in an amount equal to 40% of the receivables on that drivers' deliveries less the amount paid via the wage check. In other words, the two checks together always amounted to 40% of the delivery charges attributable to that driver.[22]

Shotgun did not deduct employment taxes from the mileage checks or pay employment taxes on these amounts because it argued its reimbursement arrangement was an accountable plan under section 1.62-2.

The Ninth Circuit distinguished *Trucks*, noting that "Trucks, Inc. allotted a uniform 6% of revenues on each load to reimburse driver expenses, whereas the percentage Shotgun paid as reimbursement fluctuated, with its 40% commission going first to cover wages (paid at the minimum allowed by law), and then to a

---

[20] *Id.* at 970.

[21] *Id.*

[22] *Id.* at 971.

12

variable remainder (i.e. as much as possible) paid as reimbursement."[23] The court concluded that "the evidence suggests that the plan's primary purpose was to treat the least amount possible of the drivers' 40% commission as taxable wages."[24]

Like *Trucks*, the instant case is distinguishable from *Shotgun*. Although there were variations among the per diem reimbursements received by individual Worldwide employees on any given day of non-local work, particularly for those who worked overtime, Worldwide's arrangement did not admit of such a wide variance as Shotgun's system plainly condoned. In *Shotgun*, there was evidence that Shotgun's arrangement was designed primarily to hide taxable wages, a central target of section 1.62-2. The government makes no contention that Worldwide's plan was designed primarily for tax avoidance.

IV

The government argues alternatively that a portion of the payments under Worldwide's arrangement fails to meet the deemed substantiated requirements of Rev. Proc. 94-77 for another reason: Because Worldwide computed its per diem payments on the basis of hours worked, under section 4.02(5) of Rev. Proc. 94-77 the per diem is treated as a "meals only" per diem allowance and can be deemed substantiated only up to the amount of the Federal M & IE

---

[23]  *Id.* at 972-73 (citation omitted).

[24]  *Id.*

13

rate, which was $26 per day during 1995 in Aurora, Illinois.  Thus, the government argues that, even if Worldwide's plan were to survive the other tests, only $26 per day could be deemed substantiated in satisfaction of Treas. Reg. § 1.62-2(e) for which Worldwide would not owe employment taxes.  Worldwide responds that the government misreads section 4.02 of Rev. Proc. 94-77 because reading it to require all hourly per diem arrangements to be limited to "meals only" would render the industry custom exception in section 3.03(2) of Rev. Proc. 94-77 for hourly per diem plans void.  We agree with the government.

First, the government does not contend that Worldwide's arrangement did not qualify as an accountable plan simply because some of the employees' reimbursements exceeded those available under the federal rate.  Nor could it make such a claim given the express provisions of Treas. Reg. § 1.62-2.[25]  Worldwide will owe employment taxes on those amounts which exceed the federal rate, but this will not undermine a finding in favor of Worldwide as to the entire arrangement's eligibility as an accountable plan.[26]

Second, as a matter of a plain reading of Rev. Proc. 94-77, the government has the better of this argument.  Treas. Reg. § 1.62-2(c) requires that the business connection test,[27]

---

[25]  *See* Treas. Reg. §§ 1.62-2(c)(1), 1.62-2(d)(2), 1.62-2(i).

[26]  *See id.* § 1.62-2(h)(2)(i)(B); Rev. Proc. 94-77, 1994-2 C.B. 825, § 8.01.

[27]  Treas. Reg. § 1.62-2(d).

substantiation requirement,[28] and return of amounts in excess of expense requirement[29] be met for a plan to qualify under § 162.2. An hourly per diem plan can satisfy the business connection test "only if, on December 12, 1989, ... a per diem allowance computed on that basis was commonly used in the industry in which the employee is employed."[30] The Commissioner has authority to prescribe rules to determine to what extent an hourly per diem plan satisfies the substantiation and return of excess requirements.[31]

In exercising this power, the Commissioner promulgated Rev. Proc. 94-77. Section 3.03(2) provides that a plan which is computed on a basis such as hours worked is not a "per diem allowance" unless it meets the industry custom exception. As stated above, this is already a requirement under Treas. Reg. § 1.62-2(d)(3)(ii) for such a plan to meet the business connection test.

In addition, Section 4 of Rev. Proc. 94-77 then more specifically provides the rules under which reimbursements under a per diem plan can be deemed substantiated to meet the substantiation requirement of sections 1.62-2(e). Section 4.02 specifically limits per diem arrangements that are "computed on a

---

[28] Treas. Reg. § 1.62-2(e).

[29] Treas. Reg. § 1.62-2(f).

[30] Treas. Reg. § 1.62-2(d)(3)(ii).

[31] Treas. Reg. §§ 1.62-2(e)(2), 1.62-2(f)(2).

15

basis similar to that used in computing the employee's wages or other compensation (e.g., the number of hours worked, miles traveled, or pieces produced)" to a "meals only per diem allowance."  A meals only per diem allowance is capped at the Federal M & IE rate by section 4.02.

In so doing, the revenue procedure is not contrary to any express provision of or allowance under Treas. Reg. § 1.62-2.[32] Section 1.62-2 imposes several requirements for hourly per diem plans to be *eligible* for accountable plan status, including the business connection test which can be satisfied by the industry custom exception under section 1.62-2(d)(3)(ii). But § 1.62-2 leaves to the Commissioner how such plans may be excepted from the usual substantiation and returning amounts in excess of expenses requirements.

Section 3.03(2) simply incorporates the additional requirement of Treas. Reg. § 1.62-2(d)(3)(ii) for all three prongs of the accountable plan test as it applies to hourly per diem plans.  That section 3.03(2)(b) also includes the industry custom exception to meet this requirement does not mean that section 3.03(2)(b) excludes the meals only limitation of section 4.02(5) from any hourly per diem plan that meets the industry custom exception.  That exception may be used to meet a threshold requirement under

---

[32]  *See Clark v. Modern Group Ltd.*, 9 F.3d 321, 335 (3d Cir. 1993) ("Treasury regulations take precedence over contrary revenue procedures because the latter are intended primarily as a guide to taxpayers.") (citing cases).

section 3.03(2), not as a free pass to obtaining accountable plan status when the hourly per diem plan does not otherwise meet the provisions of Treas. Reg. §§ 1.62-2(e) and 1.62-2(f) requiring substantiation and returning amounts in excess of expenses, both of which Worldwide's employees admittedly did not do. Indeed, Worldwide's reading would render section 4.02(5) of Rev. Proc. 94-77 void, because the substantiation and returning amounts in excess of expenses requirements do not even come into play for any hourly per diem plan that does not first meet the threshold requirement of Treas. Reg. § 1.62-2(d)(3)(ii) and section 3.03(2) of Rev. Proc. 94-77.[33]

In sum, if an hourly per diem plan can meet the requirements of Treas. Reg. §§ 1.62-2(e) and 1.62-2(f) without resort to the excepting provisions of Rev. Proc. 94-77, the plan can qualify as an accountable plan while reimbursing lodging as well as meals and incidental expenses. The Commissioner, by promulgating Rev. Proc. 94-77, has not contradicted Treas. Reg. § 1.62-2 by limiting the exceptions to the usual substantiation and returning amounts in excess of expenses requirements therein--which he is permitted to provide by rule--to per diem plans covering only meals and incidental expenses.

---

[33] It is worth noting that the only hourly per diem described in Rev. Proc. 94-77 is a meals only per diem allowance. *See* Rev. Proc. 94-77, 1994-2 C.B. 825, § 3.03(1).

17

Worldwide argues, in the alternative, that section 4.02(5) of Rev. Proc. 94-77 is not binding on this court. We reject this argument on two grounds. First, Worldwide could not satisfy the substantiation and returning amounts in excess of expenses requirements without the provisions of Rev. Proc. 94-77. Second, the revenue procedure is not contrary to the governing regulation, as we have just discussed, and so is not rendered non-binding under the facts of this case by virtue of section 1.62-2. In short, Worldwide must accept Rev. Proc. 94-77 and its limitations in its entirety or fail altogether in its quest for tax-exempt status for its travel expense reimbursement payments.

The government urges that we remand to the district court for consideration of what portion of Worldwide's payments qualified under Treas. Reg. § 1.62-2(e) and Rev. Proc. 94-77, presumably on summary judgment, along with two additional charges against certain portions of Worldwide's payments. We conclude, however, that consideration of these matters are proper for the district court to address pretrial, to the extent they may be resolved as a matter of law, or by the jury at trial. We will not, however, without more, remand with instructions that these issues be addressed on a hypothetical motion for summary judgment.

V

18

We vacate the district court's grant of summary judgment to the government and remand for further proceedings consistent with this opinion.[34]

VACATED AND REMANDED.

---

[34] With our decision to vacate the district court's judgment, we need not address Worldwide's challenge to the penalty assessed against it.

EMILIO M. GARZA, Circuit Judge, dissenting:

This case requires us to determine whether the purported reimbursement payments made by Worldwide Labor Support Services ("Worldwide") to its temporary employees for meals, lodging and other incidental expenses constituted wages for which federal employment taxes must be paid. In order to avoid the imposition of employment taxes, Worldwide's reimbursement plan must qualify as an "accountable plan" pursuant to the requirements of 26 C.F.R. § 1.62-2(d) - (f). As the majority opinion clearly explains, the process of determining whether a plan meets these requirements is complex, involving several distinct inquiries. For purposes of this appeal, however, the critical issue is whether Worldwide's plan was reasonably calculated not to exceed the amount of expenses or anticipated expenses actually incurred by its employees. The majority opinion concludes that Worldwide has established a genuine issue of material fact as to whether its plan was reasonably calculated to reimburse actual or anticipated expenses. In contrast to the majority opinion, I believe Worldwide has failed to make such a showing because their reimbursement scheme bares no

logical relationship to the actual or anticipated expenses of Worldwide's employees.[35]

Worldwide's method of calculating reimbursement expenses resulted in differing amounts of compensation to employees who were working on the same site and likely incurring similar expenses. Worldwide's reimbursement plan for the Caterpillar site initially compensated temporary employees living more than 100 miles from the plant $6.00 per hour worked for meals, lodging and other incidental expenses. In determining the reimbursement amount for each employee, Worldwide included both regular and overtime hours. In addition, an employee who worked at the Caterpillar site for more than one month received a fifty-cent increase in hourly reimbursements. After two months at the site, Worldwide gave its employees an additional fifty-cent increase, raising the hourly reimbursement rate to $7.00. Thus, two employees working at the Caterpillar site could receive substantially different reimbursement amounts depending on the total number of hours each employee worked during the week, as well as the amount of time they had been on the site. As a result, Worldwide reimbursed many employees for amounts greater than their own research indicated was the maximum amount of anticipated expenses each employee would

---

[35]It is important to note that even though this case comes to us on summary judgment and therefore the record must be viewed in the light most favorable to the non-movant, Worldwide, as a taxpayer, still bears the burden of proof as to whether the government's tax assessment was erroneous, as well as the amount of the refund due from the government. *Brown v. United States*, 890 F.3d 1329, 1334 (5th Cir. 1989).

incur. Given this fact, no rational jury could find that Worldwide's plan was reasonably calculated not to reimburse its employees for amounts in excess of actual or anticipated expenses.

Worldwide has not presented any evidence that these disparities reflected differences in the *actual expenses* of its employees at the Caterpillar site. Instead, the evidence suggests that employees incurred similar lodging and meal expenses regardless of the number of hours worked. Worldwide's employees paid for lodging by night, not by hour. Thus, an employee who worked forty hours per week, but stayed in a hotel for six nights, would incur identical costs as an employee who worked sixty hours that week, but stayed in the same hotel for six nights. As such, I do not believe that any rational trier of fact could have found that Worldwide's plan was reasonably calculated not to exceed the actual expenses of its employees.

Worldwide's employment records indicate that the actual amounts Worldwide reimbursed frequently exceeded the amount of expenses Worldwide *anticipated* each employee would incur. Worldwide estimated that its employees would spend a maximum of $58.50 per day or $409.50 per week on meals and lodging. Worldwide's payment records for the period ending August 6, 1995, reveal that it paid sixty-six workers more than the amount their research suggested was the maximum weekly expenses of their employees. Thus, under Worldwide's plan, in one pay period, about

one-quarter of their workforce was reimbursed for more than what Worldwide anticipated was the maximum amount of weekly expenses. Moreover, several of Worldwide's employees received reimbursement payments that far exceeded Worldwide's maximum estimates of $409.50 per week. For instance, Quentin Lee received $609.00 in reimbursements during the August 6 pay period and Danny McGhee received $563.50. Again, given this evidence, no reasonable jury could find that Worldwide's plan was reasonably calculated to compensate its employees for their anticipated expenses.[36]

The majority opinion attempts to counter this evidence by pointing out that an employee working eight hours per day would be

_____

[36]Worldwide relies heavily on the fact that only seven percent of its reimbursement payments exceeded the federal per diem rate of $66. As the majority opinion concedes, however, Worldwide's reliance on the federal rate is not availing because its own research indicated that the anticipated expenses of its employees would be below the federal rate for the locality. Revenue Procedure 94-77, which defines a "per diem allowance" provides:

> The term "per diem allowance" means a payment under a reimbursement or other expense allowance arrangement that meets the requirements specified in § 1.62-2(c)(1) and that is
> (1) paid with respect to ordinary and necessary business expenses incurred, or which the payor reasonably anticipates will be incurred, by an employee for lodging, meal, and/or incidental expenses for travel away from home in connection with the performance of services as an employee of the employer,
> (2) reasonably calculated not to exceed the amount of the expenses or the anticipated expenses, and
> (3) paid at the applicable Federal per diem rate, a flat rate or stated schedule, or in accordance with any other Service-specified rate or schedule.

Rev. Proc. 94-77 § 3.01. Under this regulation, the reimbursement payment must be reasonably calculated not to exceed actual or anticipated expenses *and* must be paid at the federal per diem rate or at a flat rate or stated schedule. Thus, even if Worldwide reimbursed its employees at the applicable federal rate, because its research indicated that its employee's actual and anticipated expenses were significantly lower, its payments would not be reasonably calculated to reimburse the amount of its employees' expenses or anticipated expenses under the regulations.

reimbursed for an amount within Worldwide's anticipated expense range, regardless of whether that employee was paid $6.00, $6.50, or $7.00 per hour. Thus, they contend that a rational jury could find that Worldwide's plan was reasonably calculated to reimburse its employees' anticipated expenses. The majority opinion is correct that a jury could find that reimbursement payments paid to employees who did not work any overtime hours fell within Worldwide's anticipated expense range. The problem with the majority's argument, however, is that many of Worldwide's employees regularly worked overtime, exceeding the maximum amount of meals and lodging expenses Worldwide anticipated its employees would incur as a result. Because Worldwide's employees regularly worked overtime hours, the fact that any payments fell within Worldwide's anticipated expense range was merely coincidental. A rational jury could not ignore these additional overtime reimbursement payments in determining whether Worldwide's plan was reasonably calculated to reimburse actual or anticipated expenses. Moreover, the rational jury could not ignore the fact that Worldwide regularly reimbursed its employees for more than what its own research indicated was the maximum amount of expenses per week because it included overtime hours in those reimbursement calculations.

The majority opinion finds that, if it were to accept the government's argument, no hourly per diem reimbursement arrangement could qualify as an accountable plan under the regulations. This

result seems unacceptable, since the regulations explicitly authorize such arrangements. The majority opinion, however, misinterprets the government's position. The government does not argue, as the majority contends, that an hourly per diem reimbursement method must exactly reimburse employees for expenses. Instead, the government merely contends that such an arrangement must be *reasonably calculated* to reimburse employees only for actual or anticipated expenses. In other words, the plan need not always reimburse employees for the expenses they actually incurred, but it must be structured in such a way so that there is some probability that it will do so.

In certain contexts, an hourly per diem plan such as Worldwide's could be reasonably calculated to reimburse only actual or anticipated expenses. For instance, the I.R.S.'s revenue procedures cite the example of a pilot or flight attendant who is traveling away from home. *See* Rev. Proc. 94-77 § 3.03(1). In that context, it is reasonable to conclude that the more hours a flight attendant or pilot works, the longer they will be away from home, and the more reimbursable expenses they will incur for lodging and meals. Thus, there is a logical relationship between the number of hours worked by a pilot or flight attendant and the amount of expenses incurred.[37]

---

[37] The majority opinion attempts to undermine this reasoning by pointing out that "[a] flight attendant who works eight hours a day pays the same price for a hotel room as a flight attendant who works for ten hours." Thus, the flight attendants' hourly per diem arrangement will "not perfectly correspond"

In contrast, Worldwide has not established any relationship between the hours worked by its employees and the expenses they incurred. As the majority opinion concedes, Worldwide's plan resulted in employees who were away from home for the same amount of time receiving different per diem payments. Because Worldwide's employees were away from home for the same period of time, regardless of whether they worked eight, ten, or twelve hours a day, they incurred roughly the same amount of reimbursable expenses. Nevertheless, they received different reimbursement amounts. Thus, Worldwide's plan, unlike the hourly per diem payments to pilots or flight attendants, was not reasonably calculated to reimburse Worldwide's employees for the expenses they incurred.

The preceding point is critical because the majority opinion relies heavily on the Eleventh Circuit's decision in *Trucks, Inc. v. United States*, 234 F.3d 1340 (11th Cir. 2000), to support its decision. In *Trucks*, the plan at issue reimbursed truckers for their expenses on a per diem rate based on the "load revenue" the drivers earned. The load revenue was calculated primarily by the number of miles driven, but also took additional factors such as

to the employees' expenses. The majority opinion appears to overlook that the regulations do not require a perfect correlation. They require only that an employer's reimbursement system be *reasonably calculated* not to exceed an employee's expenses. In the majority opinion's hypothetical, the two flight attendants might incur the same expenses for lodging, but would not necessarily incur the same charges for meals. As a result, it might make sense to reimburse them differently. There is certainly a reasonable relationship between the flight attendants' hours and reimbursable expenses.

weather, unloading and reloading time, and road conditions into account. *Id.* at 1341. Thus, load revenue roughly approximated the amount of time a truck driver would be driving. The greater the load revenue earned by a truck driver, the more time he would be away from home and the more expenses for meals and lodging he would incur. Given this fact, the court concluded that Trucks had provided sufficient evidence that its plan was reasonably calculated not to exceed the anticipated expenses of its employees to preclude summary judgment.

Worldwide's reimbursement scheme, however, is distinct from the one the court dealt with in *Trucks* because Worldwide's employees' expenses did not increase with each additional hour worked. Rather, I find the Ninth Circuit's decision in *Shotgun Delivery, Inc. v. United States*, 269 F.3d 969 (9th Cir. 2001), persuasive in this instance. *Shotgun* involved a messenger company whose drivers used their own vehicles to make pick-ups and deliveries. Shotgun's reimbursement scheme paid its drivers a forty percent commission on each delivery in two checks. The first check compensated the drivers for the number of hours they worked. The amount paid for hourly wages then was deducted from the forty percent commission and the remainder was included in a second check which purported to cover mileage expenses. As a result of this plan, the lesser number of hours each employee worked to make his or her deliveries resulted in a greater amount of tax-free

-27-

compensation. The court concluded that Shotgun's plan did not qualify as an "accountable plan" because the "key determinant driving the [reimbursement] allocations [was] hours worked, a factor that [bore] little, if any, correlation with mileage expenses." *Id*. at 973. The court went on to state that "Shotgun drivers doing identical routes with identical delivery charges could receive additional compensation distributions that differed according to driving time." *Id*.

Similar to Shotgun's plan, Worldwide's method of reimbursing employees bears little, if any, correlation to the actual expenses its employees incurred.[38] Moreover, underlying the *Shotgun* decision was evidence that Shotgun was attempting to encourage certain types of employee behavior at the expense of the government. In essence, a Shotgun employee who made faster deliveries, thereby working fewer hours, would receive a greater portion of his or her check tax free. Here, Worldwide's workers have a similar incentive to work more overtime hours so as to receive larger, tax-free reimbursements. Because these amounts often exceed their anticipated daily expenses, Worldwide's employees essentially

---

[38]The majority opinion asserts that *Shotgun* is distinguishable from this case because Worldwide's arrangement "did not admit of such a wide variance as Shotgun's system plainly condoned." Yet, Worldwide's employment records establish that some employees received more than double the amount of reimbursement payments of other similarly situated employees. Moreover, Worldwide paid several employees in excess of one hundred dollars per week over the sum they calculated to be the maximum amount of weekly expenses. Given these facts, it seems difficult to believe that Worldwide's plan did not condone as wide of a variance in reimbursement payments as the one at issue in *Shotgun*.

receive a tax-free bonus if they work overtime.  Thus, Worldwide's particular reimbursement method, like the one in *Shotgun*, encourages its employees to engage in conduct beneficial to the company.

Given the evidence presented, no rational jury could find that Worldwide's plan was reasonably calculated to reimbursement its employees for their actual or anticipated expenses.  Thus, I believe the district court correctly found that Worldwide's reimbursement plan did not qualify as "accountable plan" under the regulations.  For the foregoing reasons, I would AFFIRM the judgment of the district court.