**CORRECTED OPINION**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

A. T. MASSEY COAL COMPANY,
INCORPORATED; ALOE ENERGY
CORPORATION; AMERICAN ELECTRIC
POWER COMPANY, INCORPORATED;
ANDALEX RESOURCES, INCORPORATED;
APOGEE COAL COMPANY; BELLAIRE
CORPORATION; BOLOGNA COAL
COMPANY; BUNCH CONSTRUCTION
COMPANY, INCORPORATED;
CANTERBURY COAL COMPANY;
CARBON INDUSTRIES, INCORPORATED;
CEDAR COAL COMPANY; CENTRAL
OHIO COAL COMPANY; CHARLES J.
MERLO, INCORPORATED; CLEVELAND-
CLIFFS, INCORPORATED; CLIFFS MINING
COMPANY; COMMERCIAL LAND
COMPANY, INCORPORATED;
CONSOLIDATION COAL COMPANY;
CUMBERLAND RIVER COAL COMPANY;
DUKE ENERGY CORPORATION; EASTERN
ASSOCIATED COAL CORPORATION,
LLC; FREEMAN UNITED COAL MINING
COMPANY; G M & W COAL
COMPANY; GATEWAY COAL COMPANY;
GILBERT IMPORTED HARDWOODS,
INCORPORATED; HELVETIA COAL
COMPANY; HOBET MINING,
INCORPORATED; ISLAND CREEK COAL
COMPANY; JERICOL MINING,
INCORPORATED; KANAWHA COAL
COMPANY; KENTUCKY CARBON

⎱ No. 05-1996

CORPORATION; KEYSTONE COAL
MINING CORPORATION; LAUREL RUN
MINING COMPANY; LYNN LAND
COMPANY; MAPLE MEADOW MINING
COMPANY; MARMON COAL COMPANY;
MASSEY COAL SERVICES,
INCORPORATED; MEADWESTVACO
CORPORATION; MUELLER INDUSTRIES,
INCORPORATED; NACCO INDUSTRIES,
INCORPORATED; NATIONAL BULK
CARRIERS, INCORPORATED; NELL-JEAN
INDUSTRIES, INCORPORATED; NEW
WARWICK MINING COMPANY; NORTH
CAMBRIA FUEL COMPANY,
INCORPORATED; OMAR MINING
COMPANY; PALMER COKING COMPANY;
PEABODY COAL COMPANY, LLC;
PEERLESS EAGLE COAL COMPANY;
PENN POCAHONTAS COAL COMPANY;
PENNZOIL-QUAKER STATE COMPANY;
PERRY & HYLTON, INCORPORATED;
QUARTO MINING COMPANY; R&B
FALCON DRILLING (INTERNATIONAL &
DEEPWATER), INCORPORATED, LLC;
FOUNDATION AMERICAN COAL
COMPANY, LLC; RAWL SALES AND
PROCESSING COMPANY; RED ASH
SALES COMPANY, INCORPORATED;
ROCHESTER & PITTSBURGH COAL
COMPANY; RUHRKOHLE TRADING
CORPORATION; SAGINAW MINING
COMPANY; SHAWMUT DEVELOPMENT
CORPORATION; SHENANGO
INCORPORATED; SOUTHERN OHIO COAL
COMPANY; STELCO COAL COMPANY;
STELCO USA, INCORPORATED;

Tennessee Consolidated Coal Company; Tesone Land Company; The Valley Camp Coal Company; Turner Elkhorn Mining Company; US Natural Resources, Incorporated; United States Fuel Company; United States Steel Corporation; Westmoreland Coal Company; Westmoreland Coal Sales Company; Wheeling-Pittsburgh Steel Corporation; Windsor Coal Company; AK Steel Corporation; Ikon Office Solutions, Incorporated, formerly known as Alco Standard Corporation; Adam Eidemiller, Incorporated; Alex E. Paris Contracting Company; Appalachian Construction, Incorporated; Beilchick Brothers; Bentley Development Company, Incorporated; Bluestone Coal Corporation; Bollmeier Construction Company; C&A Coal Company, Incorporated; Coal State Construction Company; Codell Construction Company; Dave Hinkle Electric, Incorporated; Elgin National Industries, Incorporated; Ferrell Mine Service, Incorporated; Frank M. Sheesley Company; Gal Construction, Incorporated; Inspiration Coal Incorporated; Mittal Steel USA, Incorporated;

STANDARD OIL COMPANY, INCORPORATED; L & D, INCORPORATED; LANDZENDORFER TRUCKING, INCORPORATED; LONG BRANCH DEVELOPMENT; LONG BRANCH ENERGY; MENALLEN COKE COMPANY OF NEW SALEM; METSO MINERALS INDUSTRIES, INCORPORATED, formerly known as Svedala Industries, Incorporated; OHIO AMCO, INCORPORATED; PARDEE COAL COMPANY, INCORPORATED; RIDGE LAND COMPANY, INCORPORATED; RUSH RUN COAL COMPANY, INCORPORATED, now known as Banner Coal & Land Company; STEEL ERECTORS, INCORPORATED; TERRA INDUSTRIES, INCORPORATED; VECELLIO & GROGAN, INCORPORATED; WELDING INCORPORATED; WEST VIRGINIA ELECTRIC CORPORATION; F M C CORPORATION; PENNSYLVANIA MINES, LLC; CHISHOLM COAL COMPANY,

*Plaintiffs-Appellees,*

and

A. J. TAFT COAL COMPANY, INCORPORATED; ALABAMA ELECTRIC COOPERATIVE; BORTZ CORPORATION; BUFFALO MINING COMPANY; COWIN & COMPANY, INCORPORATED; DRUMMOND COAL SALES, INCORPORATED; EASTERN COAL CORPORATION; ELKAY MINING COMPANY; JEWELL RIDGE COAL

CORPORATION; KENTLAND-ELKHORN
COAL CORPORATION; MEADOW RIVER
COAL COMPANY; NORTH CAMBRIA,
INCORPORATED; ON MARINE SERVICES;
PITTSTON COAL GROUP,
INCORPORATED; RANGER FUEL
CORPORATION; REITZ COAL COMPANY;
SEA "B" MINING COMPANY; NORTH
AMERICAN COAL, INCORPORATED;
UNITED STATES STEEL MINING
CORPORATION, LLC; W-P COAL
COMPANY; CENTRAL CAMBRIA
DRILLING COMPANY; KERR-MCGEE
CHEMICAL WORLDWIDE LLC;
LATROBE CONSTRUCTION COMPANY;
CLINCHFIELD COAL COMPANY,
*Plaintiffs,*

v.

MICHAEL H. HOLLAND; WILLIAM P.
HOBGOOD; MARTY D. HUDSON;
THOMAS O. S. RAND; ELLIOT A.
SEGAL; CARL E. VAN HORN; GAIL R.
WILENSKY, as Trustees of the United
Mine Workers of America
Combined Benefit Fund,
*Defendants-Appellants,*

and

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,
*Defendant.*

A. T. MASSEY COAL COMPANY,
INCORPORATED; ALOE ENERGY
CORPORATION; AMERICAN ELECTRIC
POWER COMPANY, INCORPORATED;
ANDALEX RESOURCES, INCORPORATED;
APOGEE COAL COMPANY; BELLAIRE
CORPORATION; BOLOGNA COAL
COMPANY; BUNCH CONSTRUCTION
COMPANY, INCORPORATED;
CANTERBURY COAL COMPANY;
CARBON INDUSTRIES, INCORPORATED;
CEDAR COAL COMPANY; CENTRAL
OHIO COAL COMPANY; CHARLES J.
MERLO, INCORPORATED; CLEVELAND-
CLIFFS, INCORPORATED; CLIFFS MINING
COMPANY; COMMERCIAL LAND
COMPANY, INCORPORATED;     No. 05-2215
CONSOLIDATION COAL COMPANY;
CUMBERLAND RIVER COAL COMPANY;
DUKE ENERGY CORPORATION; EASTERN
ASSOCIATED COAL CORPORATION,
LLC; FREEMAN UNITED COAL MINING
COMPANY; G M & W COAL
COMPANY; GATEWAY COAL COMPANY;
GILBERT IMPORTED HARDWOODS,
INCORPORATED; HELVETIA COAL
COMPANY; HOBET MINING,
INCORPORATED; ISLAND CREEK COAL
COMPANY; JERICOL MINING,
INCORPORATED; KANAWHA COAL
COMPANY; KENTUCKY CARBON
CORPORATION; KEYSTONE COAL
MINING CORPORATION; LAUREL RUN

Mining Company; Lynn Land Company; Maple Meadow Mining Company; Marmon Coal Company; Massey Coal Services, Incorporated; Meadwestvaco Corporation; Mueller Industries, Incorporated; Nacco Industries, Incorporated; National Bulk Carriers, Incorporated; Nell-Jean Industries, Incorporated; New Warwick Mining Company; North Cambria Fuel Company, Incorporated; Omar Mining Company; Palmer Coking Company; Peabody Coal Company, LLC; Peerless Eagle Coal Company; Penn Pocahontas Coal Company; Pennzoil-Quaker State Company; Perry & Hylton, Incorporated; Quarto Mining Company; R&B Falcon Drilling (International & Deepwater), Incorporated, LLC; Foundation American Coal Company, LLC; Rawl Sales and Processing Company; Red Ash Sales Company, Incorporated; Rochester & Pittsburgh Coal Company; Ruhrkohle Trading Corporation; Saginaw Mining Company; Shawmut Development Corporation; Shenango Incorporated; Southern Ohio Coal Company; Stelco Coal Company; Stelco USA, Incorporated;

TENNESSEE CONSOLIDATED COAL
COMPANY; TESONE LAND COMPANY;
THE VALLEY CAMP COAL COMPANY;
TURNER ELKHORN MINING COMPANY;
US NATURAL RESOURCES,
INCORPORATED; UNITED STATES FUEL
COMPANY; UNITED STATES STEEL
CORPORATION; WESTMORELAND COAL
COMPANY; WESTMORELAND COAL
SALES COMPANY; WHEELING-
PITTSBURGH STEEL CORPORATION;
WINDSOR COAL COMPANY; AK STEEL
CORPORATION; IKON OFFICE
SOLUTIONS, INCORPORATED, formerly
known as ALCO Standard
Corporation; ADAM EIDEMILLER,
INCORPORATED; ALEX E. PARIS
CONTRACTING COMPANY;
APPALACHIAN CONSTRUCTION,
INCORPORATED; BEILCHICK BROTHERS;
BENTLEY DEVELOPMENT COMPANY,
INCORPORATED; BLUESTONE COAL
CORPORATION; BOLLMEIER
CONSTRUCTION COMPANY; C&A COAL
COMPANY, INCORPORATED; COAL
STATE CONSTRUCTION COMPANY;
CODELL CONSTRUCTION COMPANY;
DAVE HINKLE ELECTRIC,
INCORPORATED; ELGIN NATIONAL
INDUSTRIES, INCORPORATED; FERRELL
MINE SERVICE, INCORPORATED; FRANK
M. SHEESLEY COMPANY; GAL
CONSTRUCTION, INCORPORATED;
INSPIRATION COAL INCORPORATED;
MITTAL STEEL USA, INCORPORATED;

Standard Oil Company, Incorporated; L & D, Incorporated; Landzendorfer Trucking, Incorporated; Long Branch Development; Long Branch Energy; Menallen Coke Company of New Salem; Metso Minerals Industries, Incorporated, formerly known as Svedala Industries, Incorporated; Ohio Amco, Incorporated; Pardee Coal Company, Incorporated; Ridge Land Company, Incorporated; Rush Run Coal Company, Incorporated, now known as Banner Coal & Land Company; Steel Erectors, Incorporated; Terra Industries, Incorporated; Vecellio & Grogan, Incorporated; Welding Incorporated; West Virginia Electric Corporation; F M C Corporation; Pennsylvania Mines, LLC; Chisholm Coal Company,

*Plaintiffs-Appellees,*

and

A. J. Taft Coal Company, Incorporated; Alabama Electric Cooperative; Bortz Corporation; Buffalo Mining Company; Cowin & Company, Incorporated; Drummond Coal Sales, Incorporated; Eastern Coal Corporation; Elkay Mining Company; Jewell Ridge Coal

CORPORATION; KENTLAND-ELKHORN
COAL CORPORATION; MEADOW RIVER
COAL COMPANY; NORTH CAMBRIA,
INCORPORATED; ON MARINE SERVICES;
PITTSTON COAL GROUP,
INCORPORATED; RANGER FUEL
CORPORATION; REITZ COAL COMPANY;
SEA "B" MINING COMPANY; NORTH
AMERICAN COAL, INCORPORATED;
UNITED STATES STEEL MINING
CORPORATION, LLC; W-P COAL
COMPANY; CENTRAL CAMBRIA
DRILLING COMPANY; KERR-MCGEE
CHEMICAL WORLDWIDE LLC;
LATROBE CONSTRUCTION COMPANY;
CLINCHFIELD COAL COMPANY,
                    *Plaintiffs,*

v.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,
            *Defendant-Appellant,*

and

MICHAEL H. HOLLAND; WILLIAM P.
HOBGOOD; MARTY D. HUDSON;
THOMAS O. S. RAND; ELLIOT A.
SEGAL; CARL E. VAN HORN; GAIL R.
WILENSKY, as Trustees of the United
Mine Workers of America
Combined Benefit Fund,
                    *Defendants.*

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.
(CA-03-3389-1-RDB)

Argued: September 21, 2006

Decided: December 21, 2006

Opinion header corrected: January 19, 2007

Before NIEMEYER, TRAXLER, and SHEDD, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Shedd joined. Judge Traxler wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Jeffrey A. Clair, UNITED STATES DEPARTMENT OF JUSTICE, Civil Division, Appellate Section, Washington, D.C.; Stephen John Pollak, GOODWIN & PROCTOR, L.L.P., Washington, D.C., for Appellants. John Ray Woodrum, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Washington, D.C., for Appellees. **ON BRIEF:** Peter D. Keisler, Assistant Attorney General, Rod J. Rosenstein, United States Attorney, William Kanter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellant. William J. Murphy, MURPHY & SHAFFER, L.L.C., Baltimore, Maryland; Howard R. Rubin, William E. Copley, III, SONNENSCHEIN, NATH & ROSENTHAL, L.L.P., Washington, D.C.; John Townsend Rich, GOODWIN & PROCTOR, L.L.P., Washington, D.C., for Appellant Trustees of the UMWA Combined Benefit Fund. Margaret S. Lopez, W. Gregory Mott, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Washington, D.C.; Mary Lou Smith, Robert J. Weil, HOWE, ANDERSON & STEYER, P.C., Washington, D.C.; Douglas K. Spaulding, REED SMITH, L.L.P., Washington, D.C.; Elliott Schulder, COVINGTON & BURLING, Washington, D.C.; R. Michael Smith, DECHERT, L.L.P., Washington, D.C., for Appellees.

**OPINION**

NIEMEYER, Circuit Judge:

By enactment of the Coal Industry Retiree Health Benefit Act of 1992 ("the Coal Act"), Congress established a new multiemployer benefit plan, the United Mine Workers of America Combined Benefit Fund ("Combined Fund"), to provide health care benefits to retired coal mine workers. The Combined Fund resulted from the statutorily-mandated merger of the 1950 and 1974 Benefit Plans that had been agreed to, through collective bargaining, by the United Mine Workers of America ("UMWA") and coal mine operators. It is financed by the assets of the 1950 and 1974 Benefit Plans, by "premiums" that individual coal mine operators pay to the Combined Fund, and by government benefit plans including Medicare, and it is administered by an independent Board of Trustees. The Coal Act specifies that the premiums payable by the coal operators to the Combined Fund be determined on a per-beneficiary basis by a formula that (1) begins with the sum of payments made to all beneficiaries from the 1950 Benefit Plan and the 1974 Benefit Plan for the plan year July 1, 1991, through June 30, 1992 (the base year); (2) subtracts from that sum the "*reimbursements*" received from Medicare and other publicly financed programs for the base year but does not subtract administrative costs; (3) divides the resulting number by the number of beneficiaries in the base year; and (4) multiplies the quotient by a cost of living factor. *See* 26 U.S.C. § 9704(b)(2).

The parties commenced these actions — the most recent skirmishes in a long-running fight — to resolve whether "reimbursements" as used in the formula includes the *total* payments that Medicare made to the 1950 and 1974 Benefit Plans for the base year ($182.3 million) or only the amount that the 1950 and 1974 Funds actually paid out in Medicare benefits to beneficiaries for the base year ($156.3 million). Interpreting Medicare "reimbursements" to be the $182.3-million figure results in lower premiums for the coal operators; interpreting "reimbursements" to be the $156.3-million figure results in higher premiums.

The district court ruled that "reimbursements" unambiguously refers to the total payments ($182.3 million) that Medicare made to

the 1950 and 1974 Benefit Plans in the base year, and it declined to defer under *Chevron*[1] to the contrary interpretation put forth by the Commissioner of Social Security. *See A.T. Massey Coal Co. v. Barnhart*, 381 F. Supp. 2d 469 (D. Md. 2005).

Agreeing with the district court, we conclude that "reimbursements" is an unambiguous historical term of art used by Congress to refer to the total reimbursements that Medicare actually made, using a capitation method, to the 1950 and 1974 Benefit Plans during the base year.[2] We also conclude that because Congress did not delegate interpretative authority to the Commissioner to construe "reimbursements," her interpretation of "reimbursements" is not entitled to deference under *Chevron*. *See United States v. Mead Corp.*, 533 U.S. 218 (2001). Accordingly, we affirm.

I

A

Before enactment of the Coal Act in 1992, more than 100,000 UMWA retirees were receiving benefits under the 1950 and 1974 UMWA Benefit Plans, which were multiemployer benefit plans established through collective bargaining. By 1988, economic factors and structural inadequacies in the Plans' funding mechanisms placed these plans in financial peril. As coal operators went out of business, the stream of premiums diminished, leaving the Plans, which promised lifetime benefits to coal miner retirees, insolvent. As the Conference Report issued in connection with the Coal Act observed, "The need for legislative intervention arose because mounting deficits in the Plans threatened to curtail the flow of benefits absent a legislative solution." 138 Cong. Rec. S17,603 (daily ed. Oct. 8, 1992) (conference report). Similarly, a Senate subcommittee conducting hearings in

---

[1]*Chevron U.S.A. Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837 (1984).

[2]In reaching this conclusion, we join the Eleventh Circuit's holding in *National Coal Ass'n v. Chater*, 81 F.3d 1077 (11th Cir. 1996), and depart from the D.C. Circuit's holding in *Holland v. National Mining Ass'n*, 309 F.3d 808 (D.C. Cir. 2002), which had created a split between the circuits.

1991 heard testimony warning that more than 120,000 coal miner retirees were at risk of not receiving "the benefits they were promised" under the 1950 and 1974 Benefit Plans. *Eastern Enterprises v. Apfel*, 524 U.S. 498, 513 (1998). Despite the recognized need for congressional action, the Coal Act bill's travels were long and tortured and have been repeatedly described. *See, e.g.*, *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 444-47 (2002); *Eastern Enterprises*, 524 U.S. at 511-14; *Pittston Co. v. United States*, 368 F.3d 385, 390-92 (4th Cir. 2004).

The Coal Act created the Combined Fund under the administration of an independent Board of Trustees selected by representatives of the UMWA and the coal industry. The Combined Fund was established by the mandated merger of the 1950 and 1974 Benefit Plans, and its continued operation is financed by Medicare and other government benefit plans and by premiums fixed pursuant to a formula set out by Congress in the Coal Act.

The responsibilities for administering the Combined Fund are divided among the Secretary of the Treasury, the Commissioner of Social Security, and the Board of Trustees, but the roles assigned to the Secretary of Treasury and the Commissioner of Social Security are minor. The Secretary of Treasury is given the responsibility of determining whether there is reasonable cause for a coal operator's failure to pay assessed premiums. The Commissioner is given the responsibility of assigning coal miner retirees to coal mine operators for the purpose of calculating premiums and of calculating the premium that each operator is required to pay annually. The Board of Trustees, on the other hand, is given the more comprehensive responsibilities of administering the Fund, collecting the premiums, enrolling beneficiaries in health plans that fulfill the statute's requirements, negotiating payment rates with healthcare providers, and suing coal mine operators for the nonpayment of premiums. *See generally Pittston*, 368 F.3d at 392.

At bottom, the Coal Act sought to continue "substantially the same" benefits to beneficiaries as were provided them under the 1950 and 1974 Benefit Plans. *See* 26 U.S.C. § 9703(b)(1). Because these benefits are more comprehensive and include many benefits that otherwise would be provided by Medicare, the benefits provided by the

Combined Fund function as a "supplement" to Medicare. To provide "one-stop shopping" to beneficiaries, however, the Combined Fund, in agreement with Medicare, provides the beneficiaries with health benefits, and Medicare provides the Combined Fund with "reimbursements." This arrangement, while codified by the Coal Act, actually preexisted it when benefits were being provided by the 1950 and 1974 Benefit Plans.

Before July 1, 1990, Medicare reimbursed the 1950 and 1974 Benefit Plans for Medicare-covered health benefits they provided to coal miners on a "reasonable-cost basis." This reimbursement was made on a cash basis, so that the 1950 and 1974 Benefit Plans could seek reimbursement from Medicare only after the Plans had actually paid out benefits to the beneficiaries. This required an ongoing and complex administrative process that gave rise to numerous disputes between Medicare and the Plans.

By an agreement between Medicare and the 1950 and 1974 Benefit Plans, dated September 25, 1990, the parties resolved these pre-1990 disputes, which were up to five years old, and agreed to a new, more efficient method of reimbursement consisting of fixed forward-looking payments based on historical data — a capitation-based method of reimbursement. The capitation-based reimbursement was grounded in accrual accounting, as authorized by Medicare regulations. As the 1990 agreement related, "The parties agree that a number of advantages over the current [reasonable-cost methodology] should result from the adoption by the parties of a capitated method for determining payments to be made to the [1950 and 1974] Funds for the Medicare-covered costs of its members." The agreement explained the "capitation method" for reimbursement as follows:

> The payment for cost year 1991 will be $141.87 per member per month. This amount is based on the Fund's most recent (1990) cost report, with a UCR adjustment of 9.9 percent (determined in accordance with the most recent data now available to [Medicare]), updated by [Medicare's] actuarial estimate of the increase in costs for 1991. The payment rate includes administrative costs at the current (1990) amount, $14.71 per member per month, and payment of $127.15 for medical costs.

The September 25, 1990 agreement was formalized in a three-year contract dated January 13, 1992, that ran from July 1, 1990, through June 30, 1993.

This arrangement for "reimbursement" of the 1950 and 1974 Benefit Plans by Medicare was the arrangement for reimbursements that was in place in 1992, when the Coal Act was enacted, and had been in place since 1990. And Congress was aware of the arrangement. The Coal Commission Report, which had been prepared at the request of the Secretary of Labor and was placed in the Congressional Record, stated:

> Under a special arrangement with Medicare, beneficiaries are provided "one-stop shopping." The [1950 and 1974] Funds perform administrative services for beneficiaries and pay providers for care. In turn, the Funds receive reimbursement from Medicare, both for the costs of health services and for the overhead costs of administration.

Sec'y of Labor's Advisory Comm'n on United Mine Workers of Am. Retiree Health Benefits, *Coal Commission Report on Health Benefits of Retired Coal Miners: Hearing Before the Subcommittee on Medicare & Long Term Care of the Senate Committee on Finance*, 102d Cong. 197 (1990) (text of report) (hereafter "Coal Commission Report"). After describing the disputes that had arisen between Medicare and the 1950 and 1974 Benefit Plans because of the earlier reasonable-cost reimbursement methodology, the Report describes how the Plans and Medicare resolved their disputes and moved to prevent them in the future by using a *capitation-based reimbursement methodology*.

Thus, when in 1992 the Coal Act describes how premiums payable by coal operators are to be calculated, it refers to the actual arrangement in effect for the 1991 plan year. Under the Coal Act, each coal operator is required to pay the Combined Fund an annual premium computed by the Commissioner as follows:

> The Commissioner of Social Security shall calculate a per beneficiary premium for each plan year beginning on or after February 1, 1993, which is equal to the sum of —

(A) the amount determined by dividing —

> (i) the aggregate amount of payments from the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan for health benefits (*less reimbursements* but including administrative costs) *for the plan year beginning July 1, 1991*, for all individuals covered under such plans for such plan year, by

> (ii) the number of such individuals, plus

(B) the amount determined under subparagraph (A) multiplied by the percentage (if any) by which the medical component of the Consumer Price Index for the calendar year in which the plan year begins exceeds such component for 1992.

26 U.S.C. § 9704(b)(2) (emphasis added). And for the plan year beginning July 1, 1991, Medicare paid the Plans $182.3 million in reimbursements under a capitation-based method of reimbursement.

B

After enactment of the Coal Act and during the Combined Fund's inaugural year, staffers in the Department of Health and Human Services gave Secretary Donna Shalala a memorandum, dated October 1, 1993, presenting her a question about her administrative responsibility under the Coal Act: "How should the Coal Industry Retiree Health Benefit (Coal Act) premium be determined?" The memorandum correctly related the history of the reimbursement methods that had been employed by Medicare — the reasonable-cost methodology that preceded July 1, 1990, and the capitation-based reimbursement policy that existed since July 1, 1990. But it failed to recite the Coal Act's reference to "reimbursements for the plan year beginning July 1, 1991." Rather, the memorandum noted that under an actual-cost basis of reimbursement, the Combined Fund would have received $26 million less from Medicare (and thus *more* from the coal mine operators) than it actually did receive in 1991 under the capitation-based method of reimbursement ($156.3 million versus $182.3 million). The memo-

randum then questioned "how this $26 million [the difference between the two numbers] is to be treated for purposes of determining the per beneficiary premium under the Coal Act of 1992." The author of the memorandum gave the Secretary two choices, stated as follows:

1.  Set the fee based on defining "reimbursement" as the amount the Combined Fund paid on a fee-for-service arrangement. (This option results in more money to the Combined Fund.)

or

2.  Set the fee based on defining "reimbursement" as the Medicare capitated payments received by the Fund. (This option results in less money to the Combined Fund.)

The Secretary was provided two signature lines, one labeled Option 1 and the other labeled Option 2; she signed Option 1 (the "more money" option). By this stroke, the Secretary used a definition of "reimbursement" that harkened back to the type of reimbursements that Medicare had used *before 1990*, and not the type that Medicare had used "for the plan year beginning July 1, 1991," as required by the Coal Act.

In response to the Secretary's decision, the National Coal Association and eight coal operators sued the Secretary in the Northern District of Alabama, contending that the premiums they were required to pay to the Combined Fund reflected an interpretation of "reimbursements" contrary to the term's unambiguous meaning in the Coal Act. The coal industry argued that "reimbursements" referred to the amount of reimbursements that Medicare actually paid for the plan year beginning July 1, 1991, which was $182.3 million. The district court agreed and held that the Secretary's 1993 interpretation of reimbursements contradicted the term's unambiguous meaning in the statute and ordered the Secretary to recalculate the premium using the actual amount that the 1950 and 1974 Benefit Plans had received as reimbursements from Medicare in the base year of 1991, i.e. $182.3 million. *See Nat'l Coal Ass'n v. Shalala*, No. CV 94-H-780-S, 1995

U.S. Dist. LEXIS 21116 (N.D. Ala. June 2, 1995), *amended by* 1995 U.S. Dist. LEXIS 21125 (N.D. Ala. July 20, 1995). The district court reasoned:

> Compelling evidence of the plain meaning of the statute and Congress' intent in using the term reimbursement is found in the fact that the capitation agreement between the Secretary and the UMWA Plans had been in effect for over two years before the Act was passed. . . . It is clear that before the passage of the Act, the Secretary was using and referring to the term "reimbursement" in what can be categorized only as its plain and ordinary meaning. . . . The Secretary's argument that the plain meaning of the term reimbursement means something other than how she has been and continues to use this term in the capitation is wholly circular and somewhat imprudent.

*Id.* at *13-15. The Eleventh Circuit affirmed. *Nat'l Coal Ass'n v. Chater*, 81 F.3d 1077 (11th Cir. 1996).

After the Alabama decision, the Commissioner of Social Security, who was now substituted by statute for the Secretary of Health and Human Services to calculate the premiums, reversed the Secretary's decision, construing "reimbursements" to refer to the capitation-based method used in 1991. And, rather than modify the interpretation for just the eight coal companies formally bound by the Alabama judgment, the Commissioner decided, by letter dated July 28, 1995 ("1995 decision"), to lower the premiums for *all* coal operators nationwide by switching to the capitation-based definition of reimbursements.

In response to the Commissioner's 1995 decision, the Trustees of the Combined Fund filed suit in the District of Columbia, arguing that the Commissioner's reversal of policy misinterpreted the Coal Act and was arbitrary and capricious under the Administrative Procedure Act. The district court agreed. *Holland v. Apfel*, No. 96-01744 (CKK), 2000 U.S. Dist. LEXIS 6134 (D.D.C. Feb. 25, 2000). On appeal, the D.C. Circuit held that the term "reimbursements" as used in the Coal Act was ambiguous and that it could mean either reimbursements made on an actual-cost basis or reimbursements made on the capitation basis actually employed in 1991. *See Holland v. Nat'l Mining*

*Ass'n*, 309 F.3d 808 (D.C. Cir. 2002). In reaching this conclusion, the court relied exclusively on dictionary definitions of "reimbursement." *Id.* at 816. The D.C. Circuit accordingly vacated the district court and Commissioner's decisions and remanded the case to the Commissioner to explain why the Social Security Administration had, in 1995, adopted the capitation-based definition nationwide, when it was only obliged to do so for the eight coal operators involved in the Alabama litigation. The court noted that if the Commissioner had felt constrained by the Eleventh Circuit's ruling in *National Coal Ass'n*, then no deference was due her 1995 decision, since she was simply acting as an agent of another court. But if the Commissioner had made the choice voluntarily, then deference might be due under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

In response to the D.C. Circuit's decision, the Commissioner sent a letter, dated June 10, 2003, to the Trustees of the Combined Fund, stating that the Social Security Administration could not figure out why, in 1995, the Commissioner had adopted the capitation-based approach nationwide. The Commissioner again reversed the agency's position. She restricted the Eleventh Circuit's ruling to only those coal operators who were parties to that case, allowing them to pay a lower premium as calculated by using the capitation-based definition of "reimbursements." All other coal operators, however, would be required to pay the higher premium rate, consistent with the actual cost-based definition of "reimbursements" — the same definition adopted by the Secretary of Health and Human Services in October 1993. The Commissioner's June 10, 2003 letter, which is the Commissioner's current position, reads in pertinent part:

> While we are unable to establish the rationale for our decision in the past to apply the Eleventh Circuit's interpretation on a nation-wide basis, we believe that it is now appropriate to adopt a different approach in light of recent litigation and the current financial condition of the Fund. The recent D.C. Circuit opinion in *Holland* made clear that we were not required to apply the holding of the Eleventh Circuit to coal operators who were not parties to the *National Coal* litigation. Moreover, while considerations of fairness and uniformity remain important, the Fund's worsening financial

condition makes it essential that the Fund be afforded all the premium revenues contemplated by the Coal Act.

Accordingly, for the determination letter for the plan year beginning October 1, 2003, we intend to provide two per-beneficiary premium calculations [actual cost-based and capitation-based]. . . . We believe that this interpretation is consistent with the text and structure of the Coal Act as a whole and represents a permissible construction of the statute's plain language and of the term "reimbursement." . . . The Agency believes that implementation of the Eleventh Circuit's decision in this manner, which enhances the financial viability of the UMWA Combined Benefit Fund, is consistent with the Coal Act's stated purpose of stabilizing plan funding and allowing for the provision of health care benefits to retired coal miners and their dependents.

Reacting to the government's second reversal in its interpretation of "reimbursements," as used in the Coal Act, the coal mine operators again filed suit in the Northern District of Alabama. The Trustees of the Combined Fund responded with their own suit in the District Court for the District of Columbia. Both actions were transferred to the District of Maryland. *A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290 (N.D. Ala. 2003); *Holland v. A.T. Massey Coal Co.*, 360 F. Supp. 2d 72 (D.D.C. 2004).

After consolidating the actions, the district court in Maryland granted summary judgment to the coal operators. The court concluded that the term "reimbursements" as used in 26 U.S.C. § 9704(b)(2) is unambiguous and refers to the amounts Medicare actually *paid* to the 1950 and 1974 Benefit Plans, not just the expenses incurred by the 1950 and 1974 Benefit Plans in providing Medicare benefits to beneficiaries. The district court also held that the Commissioner's June 10, 2003 letter did not merit *Chevron* deference. Giving some respect to the agency's decision, citing *Mead*, 533 U.S. at 234-35, the district court concluded nonetheless that the Commissioner's decision was unreasonable, arbitrary, and capricious. *A.T. Massey Coal Co., Inc. v. Barnhart*, 381 F. Supp. 2d 469 (D. Md. 2005).

From the district court's judgment, the Trustees of the Combined Fund and the Commissioner of Social Security (hereafter collectively "the Commissioner") filed this appeal.

## II

The Commissioner contends that her June 10, 2003 letter interpreting "reimbursements" as used in 26 U.S.C. § 9704(b)(2) is "consistent with the plain language of the statute." To determine the plain meaning, she relies on dictionary definitions, arguing that a reimbursement "connotes, not total revenues or receipts, but only those payments that are necessary to indemnify or repay a party for its expenditures." She asserts that this meaning is "precisely the meaning adopted by [her 2003 decision]." Thus, in defining "reimbursements," the Commissioner distinguishes "payments" made by Medicare to the 1950 and 1974 Benefit Plans from "reimbursements" for amounts paid by the plans to beneficiaries, concluding that the Coal Act refers to the latter in § 9704(b)(2).

The Commissioner also argues that her interpretation "best furthers Congress' express intent to protect the financial stability of health benefits for coal miner retirees and to ensure that these benefits are *privately* funded." She points to an announced policy of the Coal Act to "provide for the *continuation of a privately financed self-sufficient program* for the delivery of health care benefits to the beneficiaries of such plans." Coal Act, Pub. L. No. 102-486, § 19142(b)(3), 106 Stat. 3036, 3037 (1992) (emphasis added).

The coal operators contend, also using dictionary definitions, that "reimbursements" is an unambiguous term that refers to Medicare's payments to the 1950 and 1974 Benefit Plans "without regard to how precisely [the payments] may approximate the costs being reimbursed." In addition, the coal operators argue that documents prepared for and contemporaneous with the enactment of the Coal Act used "'reimbursements' to refer to the total amount of payments computed on a capitation basis." In particular, they point to the Coal Commission Report, which was "the seminal document in the deliberations that led to the Coal Act" and which demonstrates that "reimbursements" referred to the capitation method of reimbursement that was

in place for the 1991 plan year, pursuant to the agreement between Medicare and the 1950 and 1974 Benefit Plans.

At the outset, we do not deny that in the abstract, the word "reimbursements" can have several meanings, as demonstrated by the dictionary definitions advanced by the parties. In a common usage, we understand that a traveling salesman may be "reimbursed" for travel expenses on either an *actual cost basis* or on a *per diem basis* and that both methods are understood to be forms of reimbursement, even though a per diem basis will not perfectly track the salesman's expenses. *See, e.g.*, *Worldwide Labor Support of Miss., Inc. v. United States*, 312 F.3d 712, 714-15 (5th Cir. 2002)(using "reimbursement" to refer to living expenses paid on a per diem basis). Likewise, the Medicare Act has authorized two different forms of reimbursement — reimbursement based on reasonable costs actually incurred and reimbursement based on prospectively assessed risks. *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 406 n.3 (1993) (noting that Medicare had, for practical reasons, changed its form of reimbursements to hospitals from a reasonable-cost basis to a fixed-amount prospective basis); *Dist. Mem'l Hosp. of Southwestern N.C. v. Thompson*, 364 F.3d 513, 515 (4th Cir. 2004) (same).

But the Coal Act is not agnostic to these varying meanings. "Reimbursements" as used in 26 U.S.C. § 9704(b)(2) has a statutory context and historical context, and both reveal a uniform and precise meaning of the term. *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context") (citation omitted).

### A

Turning first to the statutory context, the Coal Act notes on its face that it was enacted to protect the health benefits that the 1950 and 1974 Benefit Plans had promised to coal mine retirees for life but which had been placed at risk by the demise of coal companies and the imposition of the large cost of benefits on the remaining but dwindling number of signatories to the Plans. *See* Coal Act, Pub. L. No. 102-486, § 19142, 106 Stat. 3036, 3037 (1992); 26 U.S.C. § 9703(b)(1). Thus, at the beginning of the Coal Act, Congress announced its policy "for the *continuation* of a privately financed

self-sufficient program for the delivery of healthcare benefits" to the beneficiaries of the 1950 and 1974 Benefit Plans. To that end, the Coal Act retained the terms of the 1950 and 1974 Benefit Plans but merged their assets into a Combined Fund. *See id.* § 9702(a). It also charged the Combined Fund with the duty of providing healthcare services to the beneficiaries that were "substantially the same as (and subject to the same limitations of) coverage provided under the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan as of January 1, 1992." *Id.* § 9703(b)(1). To stabilize the financing of benefits, the Coal Act denied coal operators and "related companies" an easy exit from the responsibilities that the coal operators undertook when they subscribed to the 1950 and 1974 Benefit Plans. *See generally id.* § 9706 (requiring allocation of defunct coal operators' beneficiaries to related companies).

As the historically established benefits were continued under the Coal Act, so also was the historically established method of funding them through premiums paid by the coal operators. Thus, the Coal Act's formula in § 9704(b)(2) is historically based, and the Act explicitly instructed that the formula use figures as they existed in 1991, the *last full year* before the effective date of the Act: The premium was to be calculated by taking the aggregate of *historical payments* for benefits made by the 1950 and 1974 Benefit Plans for the 1991 plan year; subtracting from that sum the *historical reimbursements* received by the Plans from Medicare for the 1991 plan year; dividing the resulting sum by the *historical number* of beneficiaries in the 1991 plan year; and applying a cost of living factor to that sum each year thereafter. *See* 26 U.S.C. § 9704(b)(2). The premiums thus calculated equaled the per-beneficiary premium paid in fact in 1991 by the coal operators to the antecedent plans, subject to a cost-of-living adjustment. The Coal Act makes this clear by specifying "payments" and "reimbursements" that were made "*for the plan year beginning July 1, 1991.*" *Id.* § 9704(b)(2)(a)(i) (emphasis added). The payments and reimbursements were not amounts subject to future determination. Rather, the Coal Act refers to amounts that were actually transferred during the plan year 1991 as the basis for the premium computation. In this sense, therefore, the payments and reimbursements referred to in § 9704(b)(2) are historical events that had occurred and thus were subject to conclusive determination shortly after the Coal Act was enacted.

An examination of the books and records of the 1950 and 1974 Benefit Plans actually discloses those numbers and how they were determined. Their financial statements include the following explanation of the numbers:

> On September 25, 1990, the Trust entered into an agreement with [Medicare] which settled claims for fiscal years through 1990; however, the cost reports for fiscal years 1988, 1989, 1990 are still subject to routine audit and adjustments, if any. . . . In accordance with this agreement, effective July 1, 1990, *the Trust is being reimbursed on a capitation basis* for Medicare Part B benefits and for administrative costs. The capitation agreement requires [Medicare] to make monthly payments based on the number of Medicare eligible beneficiaries.

(Emphasis added).

*The parties agree that the reimbursement amounts that Medicare paid historically — in the plan year 1991 — to the 1950 and 1974 Benefit Funds was $182.3 million.*

Thus, when the Coal Act merged the 1950 and 1974 Benefit Plans and specified the computation of premiums based on historical numbers relating to the merged Plans, the formula was nothing more than a recapitulation of what had occurred financially in the 1991 plan year, before the Coal Act was enacted. The reference in 26 U.S.C. § 9704(b)(2) to payments made by the 1950 Benefit Plan for the 1991 plan year; the reference to the payments made by the 1974 Benefit Plan for the 1991 plan year; the reference to the number of beneficiaries in the 1991 plan year; *and the reference to reimbursements received by the 1950 and 1970 Benefit Plans in the 1991 plan year* were all specific historical numbers, requiring no complicated derivation. In computing the premium, the Commissioner had only to collect those numbers and perform the arithmetic. To that end, the Combined Fund was required to provide the Commissioner with the numbers. *See id.* § 9704(h).

On this basis, we readily conclude that the reference to "reimbursements" in § 9704(b)(2) is an unambiguous reference to the capitation-

based reimbursements actually made by Medicare during the plan year beginning July 1, 1991, and, therefore, is impervious to the Commissioner's post-hoc reconstruction of the term using dictionaries.

B

Our analysis of the statutory context of the term "reimbursements" is reinforced by the contemporaneous historical and legislative context in which the Coal Act was enacted. This history shows that the method of reimbursement adopted from the reimbursements made in plan year 1991 was a purposeful act, of which the relevant actors were aware and which Congress incorporated by reference in the Coal Act.

Under the reasonable-cost reimbursement method that Medicare and the 1950 and 1974 Benefit Plans used before 1990, disputes arose relating to the timing of when the Plans actually made payments to beneficiaries and the timing of when those costs became reimbursable. To resolve those disputes and foreclose them in the future, as well as to avoid the expensive auditing that attended the disputes, Medicare and the 1950 and 1974 Benefit Plans agreed to an alternative, but still authorized, form of reimbursement using a capitation approach. In the agreement, dated September 25, 1990, Medicare and the 1950 and 1974 Benefit Plans explicitly referred to the capitation approach as the new method of "reimbursement" that they would follow in the future. That agreement provides in relevant part:

I.  Reimbursement

> Pursuant to waivers . . . the [Plans] will be reimbursed on a risk-based capitated payment basis for a period of 3 years. . . .

* * *

> No reimbursement will be made to the [Plans] for covered Part A and Part B services furnished by a provider of services to which payment will otherwise be made.

* * *

II.  HCPP [Medicare]

  A.  The HCPP agrees to comply with the require-
      ments for participation and reimbursement as
      specified in Subpart D of the regulations . . .
      and program instructions, exempting those
      regulations . . . enabling reimbursement on a
      capitated basis.

* * *

IV.  Termination or Non-renewal of Agreement

  B.  If the [Plans] determine[ ] that . . . [they] can-
      not continue to be reimbursed on a risk-based
      capitated payment basis, the [Plans] may ter-
      minate the agreement . . . .

At the time the Coal Act was enacted in 1992, Medicare and the 1950
and 1974 Benefit Plans were operating under this reimbursement
arrangement, and the actual reimbursements made by Medicare to the
Plans in the plan year 1991 followed the capitation approach and
amounted to $182.3 million.

  In addition to the preexisting agreement, the Coal Commission
Report, which led to the enactment of the Coal Act, describes Medi-
care's capitation payments as "reimbursements." The Report says:

    During the Commissions deliberations, in late September of
    1990, the [1950 and 1974] Funds and Medicare resolved the
    reimbursement dispute in the context of moving toward a
    capitated reimbursement arrangement for FY 1991 and the
    future.

*Coal Commission Report* 198. The Coal Commission Report included
the following definition of "capitated reimbursement":

An arrangement under which a health care provider receives a prospectively determined payment for services provided to patients. The advantage of a capitated reimbursement arrangement is that it creates incentives which may result in reduction in the amount of inappropriate and excessive services provided.

*Id.* at 251. Further, the Report, celebrating the benefits of a capitation approach, stated "[c]apitation reimbursement offers better incentives for cost savings and simplified reimbursement methodology. Capitation reimbursement has the advantage of providing prompt and predictable reimbursement to the Funds, enabling them to strike better bargains with providers." *Id.* at 199.

There is yet more evidence of the contextual understanding of "reimbursements" as used in the Coal Act. As already noted above, the annual reports of the 1950 Benefit Plan and the 1974 Benefit Plan for the 1991 plan year, the last full year before the Coal Act was enacted, refer to the capitated Medicare payments as "reimbursements": "In accordance with [the September 25, 1990 agreement] effective July 1, 1990, the Trust is being *reimbursed on a capitation basis* for Medicare Part B benefits and for administrative costs." Moreover, the Combined Fund *in its own disclosures*, made immediately after the Coal Act was passed, referred to Medicare's payments as "reimbursements":

[The Combined Fund] is entitled to *reimbursement* under a capitation agreement for those medical costs. . . . *These reimbursements* have been accrued and recorded.

* * *

*Medicare reimbursements* are paid monthly on a capitation basis, with the monthly capitation rate adjusted annually.

(Emphasis added).

And this contextual evidence continues even to the year of Secretary Shalala's 1993 decision. In an internal memorandum written to

the Board of Trustees in 1993, the Director of Operations of the Combined Fund reported on the Fund's performance under the capitation method of reimbursement: "Table I compares the total Funds' quarterly . . . reimbursable medical and administrative cost per capita . . . to the negotiated *capitation reimbursement rate*." (Emphasis added). The same memorandum directly compares the "Actual Medicare Part B *Expense*" with the "Capitation *Reimbursement*," describing the very figures at issue in this case. The $182.3 million is described as the "HCFA [Medicare] *Reimbursement*." The $156.3 million is described as the "Total Net *Expense* FY 92."

Nowhere in the historical record does anyone use "reimbursements" to mean what the Commissioner now says it means. When the term "reimbursements" was used, it *always* referred to the total payments made by Medicare to the 1950 and 1974 Benefit Plans or to the Combined Fund, not the "total net expense" they incurred in providing benefits to beneficiaries or what Medicare would have paid using a reasonable cost-based reimbursement method.

C

The Commissioner fails in this appeal to address the statutory and historical context of the word "reimbursements"; Secretary Shalala failed to do so in her 1993 decision; and the Commissioner failed to do so in her 2003 decision. Yet the Coal Act requires this consideration because its formula is based on what happened in the 1991 plan year.

The Commissioner's arguments are made almost entirely in the abstract, relying on dictionary definitions and failing to take into account the contextual use of the term "reimbursements." Yet, in using dictionary definitions, the Commissioner's arguments are divorced not only from the 1991 context but even from the context that existed before the 1990 agreement between Medicare and the 1950 and 1974 Funds. For example, she invokes various dictionary definitions to support the obvious proposition that "reimbursements" refers to a payment commensurate with monies paid out. But she does not elaborate on how close the connection between the outflow and the income must be. Focusing more precisely on her argument, she asserts that her interpretation rests "not on aggregate payments made

by Medicare to the UMWA plans, but on the portion of those pay-ments necessary to 'indemnify' or 'repay' the plans for the sum those plans expended in providing Medicare benefits to plan beneficiaries." This "indemnification" notion, however, does not fit the context either. Medicare never paid the plans the *actual costs* incurred on Medicare's behalf, even before the 1990 agreement. Rather, the actual costs were always adjusted downward by as much as 9.9% to yield the "reasonable costs." Thus, before the 1990 agreement, Medicare reimbursed the 1950 and 1974 Benefit Plans only to the extent that their tracked expenditures were "reasonable," that is, similar to the costs of other health benefit plans. Thus, even under the reasonable-cost reimbursement method that Medicare employed before 1990, Medicare did not reimburse in the sense that it was "indemnifying."

The Commissioner also contends that because the computation set forth in 26 U.S.C. § 9704(b)(2) establishes a base level of premium for future years, to be adjusted only for the medical component of the consumer price index, the difference between capitation reimburse-ment and reasonable-cost reimbursement is a "multi-million dollar mistake" in favor of the coal operators, which must be corrected, cit-ing *Regions Hospital v. Shalala*, 522 U.S. 448 (1998). In *Regions*, the Supreme Court approved the Secretary's adoption of a reaudit rule in order to correct some *erroneously* reimbursed costs under the Medi-care Act. In this case, however, there was no error in the form of reimbursement because Medicare intentionally adopted and correctly calculated the capitation method. Both Medicare and the 1950 and 1974 Benefit Plans considered the capitation method to be superior to the reasonable cost-based method, not a "mistake." This was so for several reasons.

*First*, the capitation-based method of reimbursement saved admin-istrative and negotiation costs because it paid the 1950 and 1974 Ben-efit Plans based on historical averages instead of on the retroactive calculations of costs that had led to long-running disputes, plaguing the relationship between the parties over the years.

*Second*, the capitation methodology improved the incentive for the 1950 and 1974 Funds to economize on healthcare costs. Under the "reasonable cost" reimbursement method, the Benefit Plans had an incentive to save only enough to make their costs "reasonable," which

meant in line with the average for other Medicare-reimbursed plans. Even though that reimbursement method was better than a one-for-one indemnification form of reimbursement — which encourages heedless spending — the reasonable-cost method still left plenty of room for overspending. The capitation method created incentives for the 1950 and 1974 Benefit Plans to treat Medicare dollars as their own because any money left over from the capitation payment during one year would stay with the Plans "to offset future costs."

The parties explicitly identified this reasoning as part of the basis for adopting a capitation-based method of reimbursement in 1990, and it was reported in all of the contextual documents. Accordingly, when Congress referred to "reimbursements" that were actually made during the 1991 plan year, it referred not to a "mistaken" reimbursement plan but to an alternative reimbursement plan that the relevant parties thought would be more efficient. Congress' incorporation of the capitation reimbursement method in § 9704(b)(2) was intentional and not a "mistake." The clear expectation was that the capitation method would continue as an improvement over the reasonable-cost method and would not result in Combined Fund shortfalls.

Finally, the Commissioner argues at a general level that using the higher reimbursement figure will starve the Combined Fund of premiums, potentially resulting in reduced health benefits to retired coal miners — precisely the outcome that the Coal Act was intended to avoid. If such an outcome does emerge, however, it will only be because the inflation factor specified by Congress in the Coal Act or Medicare's reimbursements have proved insufficient to stay abreast of the rising costs of providing the benefits specified in the 1950 and 1974 Benefit Plans. *See* 26 U.S.C. § 9703(b)(1). The Act does not grant the Commissioner authority to change the formula, and ongoing problems undoubtedly will prompt either the coal operators, the UMWA, or both to return to Congress.

For all of these reasons, we readily conclude that the reference in § 9704(b)(2) to "reimbursements" made for the plan year 1991 is unambiguous and refers to those payments made by Medicare to the 1950 and 1974 Benefit Plans for the plan year 1991 in the amount of $182.3 million.

### III

The Commissioner argues, in addition to her position that her interpretation of "reimbursements" is "fully consistent with well-settled usage and the primary definition of the term," that Congress "impliedly delegated authority" to her to construe the term and that therefore we must defer to her interpretation and determine only whether her interpretation is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 842-43. Her reliance on *Chevron* to give weight to her interpretation, however, is misplaced.

While *Chevron* analysis often results in affording deference to agency interpretations of statutes, that deference is limited to circumstances where (1) Congress has given the agency authority to make rules carrying the force of law and (2) the agency's interpretation is rendered in the exercise of that authority. *See United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). More precisely, *Mead* refined the standard for deference, describing the type of agency action deserving of *Chevron* deference this way:

> We hold that administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

*Id.* Thus, the Court in *Mead* observed that even though agencies charged with applying statutes will make "all sorts of interpretive choices," "not all of those choices bind judges to follow them." *Id.* at 227.

Before according deference to an agency interpretation, the agency must therefore demonstrate that Congress delegated authority to the agency to make such an interpretation, and we look for an explicit or implicit grant of interpretive power from Congress to the agency. If

the grant is not explicit, "it can still be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law." *Mead*, 533 U.S. at 229. If there is no such grant, however, explicit or implicit, binding interpretive authority rests only with the courts. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

In determining whether Congress has implicitly delegated authority to an agency, courts must examine the whole statute to determine whether a congressional intent to delegate can reasonably be inferred. *See Mead*, 533 U.S. at 229. If the agency's decision and the processes authorized to make that decision resemble legislative decisions and legislative processes, the agency stands in the shoes of Congress, and its decisions carry the force of law. For instance, formal procedures, such as notice-and-comment rulemaking, provide clear evidence that the agency stands in the shoes of Congress and deserves deference. *Id.* at 229-30. But there can be delegation without such formal procedures so their absence is not conclusive. *See Barnhart v. Walton*, 535 U.S. 212, 222 (2002).

We do not undertake to describe all of the possible forms that a congressional grant of interpretive authority might take. But when the responsibility given to the agency does not present any of the normal indicia of a legislative-type determination — i.e. those of weighing conflicting policies, considering adversarial viewpoints, promulgating forward-looking rules of general applicability — we can usually assume that Congress did not delegate interpretive authority to the agency. An agency may try to create the appearance of delegation through the use of legislative-type processes, but this, of course, does not create delegation where none exists. Following a more sophisticated process might garner more judicial respect, but delegation must appear from the statute itself, not from the agency's actions. *See Walton*, 533 U.S. at 222.

If we conclude that Congress has delegated authority to the agency to make rules carrying the force of law, then we proceed to the traditional two-step *Chevron* analysis. "[I]f the intent of Congress is clear [with respect to the matter that the agency has interpreted], that is the

end of the matter; for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. We will overturn unreasonable agency decisions because we presume that Congress does not authorize unreasonable statutory constructions. At bottom, however, a court "may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of the agency." *Id.* at 844.

On the other hand, when we determine that no delegation can be implied, as when the task of the agency is merely to perform a ministerial calculation or to issue a document whose contents are dictated in detail by the statute, we do not afford the agency the type of deference we otherwise would afford if the agency acted by delegation in Congress' stead. For those kinds of tasks, Congress has already spoken and its words are cast. The opinions of agencies pursuant to such provisions do not carry the imprimatur of delegation. Even though the task may require the agency to make interpretive decisions, produce a binding rule, or issue a mandate in its field of expertise, we need not yield because there is no predicate delegation as required by *Mead*.

In the case at hand, section 9704(b)(2) gave the Commissioner the responsibility of "calculating" the per-beneficiary premium that the coal operators must pay to finance the Combined Fund. The authorization to calculate the premium, however, did not include a delegation of authority to set the premium so that the fund would be "well financed" or "viable." To the contrary, Congress specifically laid out the formula for the calculation that the Commissioner had to perform and delegated only the ministerial task of making the calculation.

Moreover, looking to the statute as a whole, the Coal Act does not generally confer anything but ministerial responsibilities on the Commissioner. The Coal Act gives the Commissioner exactly one other function, that of assigning beneficiaries to coal operators for the purpose of determining the particular coal operator's annual premium. *See* 26 U.S.C. § 9706(a). And again, the assignment of eligible beneficiaries does not afford the Commissioner discretion to achieve a par-

ticular end. Rather, it must be accomplished according to a strict algorithm set forth in § 9706(a). Each of the two functions conferred on the Commissioner is thus described by Congress in elaborate detail.

In calculating the premiums, the Commissioner need only assemble the actual historical figures and perform the necessary arithmetic. The figures are not described in conceptual terms such as "reasonable reimbursements" or "appropriate expenditures." Rather, the Commissioner must recognize the historical facts and apply them — that is where her authority begins and ends. *See id.* § 9704(b)(2); *see also id.* § 9704(h) (referring to the Commissioner's obligation to "compute" the premium). And in assigning beneficiaries to coal operators for payment of premiums, the Commissioner again acts strictly pursuant to the statutory provision, which provides a clear, rote order of assignment, that the Commissioner may not alter for policy reasons. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461 (2002).

The absence of delegation to the Commissioner becomes even clearer when one compares her duties with those of the Board of Trustees. The Trustees are uniquely suited to make policy decisions, since their composition reflects the structural compromise embodied in the Coal Act. The coal industry appoints two members; the UMWA appoints two members; and those four appoint the remaining three members. *See* 26 U.S.C. § 9702(b)(1). For this reason, the Trustees have all of the policymaking powers under the Act. *See, e.g.*, *id.* § 9703(b)(1) (requiring Trustees to provide "to the maximum extent feasible" substantially the same coverage as were provided by the prior plans); *id.* § 9703(b)(2) (authorizing Trustees to "negotiate payment rates with the healthcare services plans . . . which vary as necessary" to provide uniform benefits in geographical areas); *id.* § 9704(b)(3) (authorizing Trustees — significantly *not* the Commissioner — to adjust the premium to compensate for reduction of Medicare payments).

The contrast between the Commissioner's wholly ministerial functions and the wide policymaking berth given to the Trustees could not be more stark. The structure of the statute refutes any claim that Congress delegated interpretive authority to the Commissioner of Social Security because on all matters requiring policy judgment the Trust-

ees, not the Commissioner, have Congress' blessing to exercise judgment on its behalf.

The Commissioner has cited *Holland v. Pardee Coal Co.*, 269 F.3d 424 (4th Cir. 2001), and *Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2003), as cases where we have given her *Chevron* deference under the Coal Act. These cases, however, provide the Commissioner with little or no assistance. *Pardee* only noted that "*if* deference were warranted, it would have no impact on the resolution of this case." *Id.* at 431 n.8 (emphasis added). It did not conclude that *Chevron* deference was appropriate. Similarly, *Pittston* provides little comfort because it involved a gap in the assignment-of-beneficiaries provision created when the Supreme Court found a portion of that provision unconstitutional. 368 F.3d at 392. Once that gap was created, the agency was left with an open policy space, which was the quintessence of legislative-type action to which *Chevron* deference was due. *Id.* at 402-03. Of course no such gap has been created by Congress or, indeed, the Supreme Court, in the formula for calculating the premiums to be charged coal operators.

## IV

Even though *Chevron* deference is inapplicable to the Commissioner's position, the Commissioner still claims that her determination is entitled to some respect notwithstanding her limited role under the Coal Act. *See Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). As the Supreme Court stated in *Skidmore*:

> [O]pinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Id.* at 140.

Yet, in twice calculating premiums under 26 U.S.C. § 9704(b)(2), the Social Security Administration has, without conducting a review of the Coal Act and its contexts, developed virtually no experience that might be considered a "body of experience and informed judgment to which courts and litigants may properly resort for guidance." The Commissioner's ipse-dixit declaration in her June 10, 2003 letter defining how "reimbursements" is used in § 9704(b)(2) is simply unsupportable and therefore due no respect under *Skidmore*.

In her 2003 letter, the Commissioner reconsidered the 1996 premium decision made by her predecessor in light of the D.C. Circuit's opinion in *Holland v. National Mining Ass'n*, 309 F.3d 808 (D.C. Cir. 2002). That decision pointed out that the Eleventh Circuit decision in *National Coal Ass'n v. Chater*, 81 F.3d 1077 (11th Cir. 1993), bound the Commissioner only with respect to the eight coal operators who were parties to that litigation and that the Commissioner could have, though need not have, adopted a different rule with respect to the remaining coal operators for their contributions to the Combined Fund. 309 F.3d at 816-17. But the Commissioner was *not* free to evade the unambiguous text of the Coal Act.

The Commissioner considered the D.C. Circuit's ambiguous mandate and elected to reverse course from the policy of the preceding eight years, except with respect to the coal operators who were party to the *National Coal Ass'n* case. She gave two reasons: (1) a generic proclamation that the new policy was consistent with the Coal Act and (2) a concern for the "financial viability" of the Combined Fund. In essence, the Commissioner's rationale for her decision was a naked desire to direct extra money to the Combined Fund by recalculating the premiums, and the Act, she concluded, let her get away with it. But, despite a decade of litigation in two district courts and two courts of appeal in which all possible meanings of the word "reimbursements" were considered in exhaustive detail, the Commissioner never made even a passing attempt to justify her decision under the statute. Nor are the financial difficulties of the Combined Fund articulated in the 2003 letter, so that even her impermissible, asserted rationale lacks support. The contributors to the Combined Fund, who were expected to spend $70 million in retroactive premiums and more going forward, rightly concluded that they deserved a better analysis.

The Commissioner's 2003 decision fails each of the prerequisites for *Skidmore* respect. Virtually no reasoned consideration appears on the face of the decision; none has appeared from the depositions attendant to this litigation; and what reasoning does appear is invalid. Congress did not charge the Commissioner with ensuring the financial viability of the Combined Fund. Her job was to calculate the formula established by Congress by using actual historical figures. In performing her job, she was bound to obey the words of Congress and to determine, through a reasoned analysis, what those words fairly meant. No evidence of such an effort appears.

Additionally, the emphasis on the wealth of the Combined Fund suggests an improper understanding of the Commissioner's role. As we described earlier, the structure of the Coal Act grants the Trustees policymaking authority to administer the Combined Fund. The Trustees, who represent both the coal industry and the coal miners, constitute a quasi-legislative body, well-situated to weigh the Coal Act's competing policies. The Commissioner, on the other hand, has no policymaking authority. Her duties are tightly circumscribed — in this case — to calculate certain numbers in a mechanical fashion. By taking sides in the dispute between the coal operators and the UMWA, the Commissioner abandoned neutrality and any legitimate claim to judicial respect under *Skidmore*.

Finally, the inconsistency of the Commissioner's positions over the years destroys any residual legitimacy. The policy history in this case has a certain tidal quality. In 1993, the Secretary of Health and Human Services opted for an actual-costs interpretation of "reimbursements" that gave the Combined Fund the most money, without regard to what Congress specified. Three years later, the Commissioner of Social Security reversed that interpretation and followed the Eleventh Circuit's decision in *National Coal Ass'n*. Nine years later, after the D.C. Circuit's decision in *Holland*, the Commissioner yet again reversed her position. While the Commissioner's open-mindedness might in some contexts be considered admirable, we would not yield to such undulations in interpreting a statute, even were we uncertain as to the statutory meaning. *See Pauley v. Beth Energy Mines, Inc.*, 501 U.S. 680, 698 (1991) ("[T]he case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views"); *Watt v. Alaska*, 451 U.S.

259, 272-73 (1981) (noting that inconsistent interpretations garner "considerably less deference").

The judgment of the district court is accordingly

*AFFIRMED*.

TRAXLER, Circuit Judge, dissenting:

Respectfully, I agree with the Court of Appeals for the District of Columbia Circuit that the term "reimbursements," a component of the "per beneficiary premium" formula prescribed by the Coal Act in § 9704(b)(2), is not clear and unambiguous. *See Holland v. National Mining Ass'n*, 309 F.3d 808, 816 (D.C. Cir. 2002). Although I am inclined to agree that the Commissioner's interpretation is not entitled to deference under the framework of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), I would nevertheless sustain the Commissioner's use of an actual-cost basis for reimbursements in determining the per beneficiary premium to be paid by coal companies ("coal operators"), rather than the risk-capitation basis which resulted in a $25.5 million windfall of sorts to the coal operators. Accordingly, I would reverse the decision of the district court.

The Coal Act, in order to finance benefits provided by the Combined Fund, mandates the payment of an annual premium by each coal operator. *See* 26 U.S.C. § 9704(a). One component of this annual premium is a "health benefit premium," 26 U.S.C. § 9704(a)(1), which is determined by multiplying a standard "per beneficiary premium" by "the number of eligible beneficiaries assigned [by the Commissioner] to [a given coal] operator under section 9706," 26 U.S.C. § 9704(b)(1).

In turn, the "per beneficiary premium" is calculated annually by the Commissioner according to a statutorily prescribed formula. *See* 26 U.S.C. § 9704(b)(2). In simple terms, the per beneficiary premium reflects the average cost to the UMWA Benefit Plans of health benefits for an individual beneficiary during the Coal Act's "base year" — 1991, the final year before the 1950 and 1974 Benefit Plans merged

under the Coal Act to become the Combined Fund. *See* 26 U.S.C. § 9704(b)(2)(A); *Holland*, 309 F.3d at 811.*

Significantly, the statutory formula for determining this average cost of individual health benefits during the 1991 base year excludes "reimbursements" from the calculation: The per beneficiary premium is "the aggregate amount of payments from the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan for health benefits (*less reimbursements* but including administrative costs) for the plan year beginning July 1, 1991, for all individuals covered under such plans for such plan year," divided by the number of eligible beneficiaries that year. *See* 26 U.S.C. § 9704(b)(2)(A)(i) and (ii) (emphasis added). The treatment of "reimbursements" ensures that the baseline per beneficiary premium reflects the average cost of only those benefits covered by the UMWA Benefit Plans. To avoid overlap with federal benefit programs, the UMWA Benefit Plans did not provide benefits for services covered by such programs — most notably Medicare. *See National Coal Ass'n v. Chater*, 81 F.3d 1077, 1079 (11th Cir. 1996) (per curiam). For the convenience of the beneficiaries of the UMWA Benefit Plans, however, the Plans followed an administrative practice of paying health care providers for all services rendered, even if such services were covered by Medicare or another government program and not by the UMWA Benefit Plans. The Plans then sought repayment for any such services, thus relieving the individual beneficiaries of the burden of seeking payment from multiple benefit plans. *See Holland*, 309 F.3d at 811; *National Coal Ass'n*, 81 F.3d at 1079. Thus, the formula set forth in section 9704(b)(2) is designed so that Medicare and other government benefits not covered by the UMWA Benefit Plans would not skew the average cost of UMWA benefits during the base year as a result of the Plans' efficient administrative practices.

The parties' competing interpretations of "reimbursements" are rooted in the pre-Coal Act administrative practices of the UMWA Benefit Plans. Prior to 1990, the UMWA Benefit Plans presented claims for reimbursement based on covered Medicare services *actu-*

---

*The Coal Act directs the Commissioner to adjust this baseline amount for inflation each year. *See* 26 U.S.C. § 9704(b)(2)(B); *The Pittston Co. v. United States*, 199 F.3d 694, 699 (4th Cir. 1999).

*ally* received by Plan beneficiaries and paid for by the Plans. *See National Coal Ass'n*, 81 F.3d at 1080; *Holland*, 309 F.3d at 811. This cost-based method of reimbursement, however, produced ongoing disputes over covered services and reimbursement amounts. In 1990, the parties adopted a different practice, entering into a "risk capitation" agreement under which Medicare paid the UMWA Benefit Plans a predetermined monthly flat fee based on *projected* Medicare expenditures. *See National Coal Ass'n*, 81 F.3d at 1080; *Holland*, 309 F.3d at 811. As it turned out, the projected expenses (resulting in the payment of a $182.3 million flat fee to the Plans) exceeded actual costs during the base year ($156.8 million) by $25.5 million. *See Holland*, 309 F.3d at 811.

The Coal Act does not define the term "reimbursements." For undefined statutory terms, courts accord them "their ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995); *Schlossberg v. Barney*, 380 F.3d 174, 180 (4th Cir. 2004) ("In the absence of expressed Congressional intent, we must assume that Congress intended to convey the language's ordinary meaning." (internal quotation marks omitted)). The parties emphasize different aspects of the same dictionary definitions to support their readings of the text as most faithful to the ordinary meaning of the words. Appellants emphasize the notion of equivalency — that "to reimburse" is "to pay back (an *equivalent* for something taken, lost or expended) to someone: [r]epay" or "to make restoration or payment of an *equivalent* . . . : [i]ndemnify." *Webster's Third New International Dictionary* 1914 (1981); *see Holland*, 309 F.3d at 816. The coal operators, by contrast, contend that "reimburse" in the "repayment of an equivalent" sense is not necessarily limited to repayment on a dollar-for-dollar basis. *See National Coal Ass'n*, 81 F.3d at 1082. For example, they suggest expenses may be "reimbursed" on a per diem basis where the fixed per diem amount serves as the "equivalent" of the expenditures.

In this instance, as suggested by the split between the circuit courts of appeal, the "ordinary meaning" approach is not helpful in determining congressional intent as to the meaning of "reimbursement." Because either reading is plausible on its face, I find the statute ambiguous. *Compare Holland*, 309 F.3d at 816 ("The Eleventh Circuit's analysis is somewhat perplexing, because it acknowledges that reimburse means to pay back *an equivalent* for something expended

. . . , and yet the opinion concludes that reimbursement is not restricted dollar-for-dollar [to] what the reimbursed party payed out. If anything, the Eleventh Circuit's opinion seems to confirm the statute's ambiguity.") (internal quotation marks omitted) *with National Coal Ass'n*, 81 F.3d at 1082 (concluding, based on the dictionary definition, that the statutory text unambiguously refers to "the entire amount of the capitation payments that were made to the UMWA plans").

Looking beyond the *Webster's* definition of "reimburse," the coal operators argue that the statute is unambiguous because the "per beneficiary formula" uses 1991 as a base year, and Congress was aware that a risk-capitation arrangement was in effect in 1991. In support of this argument for an unambiguous text, the coal operators offer legislative history and other extrinsic materials to demonstrate that the UMWA Benefit Plans and Medicare had agreed to handle the actual-cost dilemma via the capitation agreement. In my view, legislative history cannot be used to establish the plainness of the statutory text, *see United States v. Gonzales*, 520 U.S. 1, 6 (1997), and it probably ought not be used, as the coal operators do here, to "confirm" the meaning of a statute if the statute is indeed unambiguous, *see Zedner v. United States*, 126 S. Ct. 1976, 1991 (2006) (Scalia, J., concurring) ("[I]f legislative history is relevant when it confirms the plain meaning of the statutory text, it should also be relevant when it contradicts the plain meaning, thus rendering what is plain ambiguous."). The statutory text is quite clearly the best evidence of congressional intent and, therefore, judicial inquiry ends with the conclusion that the statute is clear and unambiguous. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). In sum, a statute's clarity, or lack thereof, cannot be discovered from extrinsic sources — such materials become useful only after it becomes apparent that the statute itself is unclear or ambiguous. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 125 S. Ct. 2611, 2626 (2005).

But beyond that, I do not find the legislative history terribly helpful in deciphering congressional intent. The report of the Coal Commission is the primary source of legislative history offered by the coal operators, and it indeed references "capitated reimbursement" in explaining the current state of affairs in the coal industry's pre-Coal Act health benefit system. Since the report does not represent the

understanding of Congress as a whole, these references do not necessarily mean that Congress meant "capitated reimbursement" when it merely said "reimbursement." In fact, I cannot be sure of the more basic premise that the Coal Commission's report establishes that Congress was "aware" that, in 1991 in this specialized context, "reimbursement" carried a specialized meaning. Indeed, as the Trustees point out, the principal sponsor of the Act, Senator Rockefeller, suggested "reimbursements" meant "payments by the plans for Federal program benefits." 138 Cong. Rec. 34034. Of course, the statement of an individual senator is obviously not controlling evidence of congressional intent, but it highlights the generally ambiguous nature of legislative history. Nor do I find the private parties' understanding of the capitation arrangement relevant to congressional intent. In sum, these extra-textual sources offered by the coal operators do not indicate that Congress was referring in section 9704(b)(2)(A)(i) to all payments made pursuant to the capitation agreement.

The text on its face directs the Commissioner to calculate the per beneficiary premium using base year, or 1991, figures — meaning that the Commissioner would simply gather and plug in historical data about reimbursements received in 1991. Viewed in light of the text and the purpose of the statute itself, however, I cannot conclude that Congress thought of this fixed capitation arrangement, which produced a $25 million overpayment from Medicare, as a "reimbursement." Indeed, the Coal Act suggests the opposite. The per beneficiary premium is based on the average cost of *Plan benefits* to a coal operator. It would be a curious approach for Congress to attempt to achieve such a result by directing that capitation payments far removed from actual costs be used. Moreover, the coal operators' preferred interpretation would run contrary to a fundamental purpose of the Coal Act: to continue private funding of the UMWA Benefit Plans. Instead of burdening the public fisc with the coal operators' obligation to continue providing benefits to retired miners, Congress sought "to provide for the continuation of a privately financed self-sufficient program for the delivery of health benefits to the beneficiaries of such plans." Pub. L. No. 102-486, § 19142(b)(3); *cf. Shenango Inc. v. Apfel*, 307 F.3d 174, 195 (3d Cir. 2002) ("In short, the Coal Act's key objective is to ensure that the costs of providing retirement benefits will, so far as possible, be borne by the private parties most

responsible for creating retired miners' expectations of lifetime health benefits.").

Based on the foregoing, I view the statute as ambiguous and would so hold. I agree, however, that *Chevron* deference is not applicable to the Commissioner's decision in this instance. Ordinarily, the next step would be to consider whether the agency decision is entitled, based on its power to persuade, to "deference" under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Because the position ultimately adopted by the Commissioner is the position I would adopt if I were construing the statute from scratch, I would reverse regardless of whether *Skidmore* deference is appropriate. *See Edelman v. Lynchburg College*, 535 U.S. 106, 114 & n.8 (2002). As noted, the construction advanced by the coal operators runs contrary to a primary purpose of the Coal Act to ensure the continued private-financing of health benefits for retired miners. In effect, the $25.5 million overpayment to the UMWA Benefit Plans resulted in a windfall for the coal operators and shifted some of the burden of paying for benefits under the Coal Act from private entities to Medicare. Accordingly, in the absence of clear and unambiguous statutory language, and without definitive legislative history to clear up the statute, I would read the word "reimbursement" consistently with the express purposes of the Coal Act and affirm the Commissioner's application of the per beneficiary premium under section 9704(b)(2)(A)(i).